Ruby R. Goodman, Administratrix of the Estate of Howard F. Goodman, Deceased, Appellee, v. Chicago, Burlington and Quincy Railroad Company, Appellant.

Gen. No. 39,049.

Opinion filed March 24, 1937. Rehearing denied April 12, 1937.

GARDNER, FOOTE, MORROW & MERRICK, W. A. MORROW, WALTER M. FOWLER and C. W. KROHL, all of Chicago, for appellant; J. C. JAMES, of Chicago, of counsel.

SAMUEL COHEN, of Chicago, for appellee.

MR. PRESIDING JUSTICE DENIS E. SULLIVAN delivered the opinion of the court.

This suit was brought under the Federal Employers' Liability Act, Ill. State Bar Stats. 1935, ch. 114, ¶¶ 321–329, in which the plaintiff, suing as administratrix of the estate of her deceased husband, claimed damages on account of his death, which, it is alleged, was caused by the negligence of the defendant. The verdict of the jury found the defendant guilty and assessed the damages at $30,000 in plaintiff's favor. The jury also answered a special interrogatory as to the amount of damages they ''deduct'' caused by the contributory negligence of the deceased, as $20,000. The court entered judgment upon the verdict against defendant for $30,000.

Plaintiff contends that defendant's negligence consisted in drawing coal cars out from a spur track onto the main line in front of the train driven by plaintiff's intestate without first ascertaining that the train driven by decedent was approaching; that it was a custom for crews in charge of yard engines pulling coal cars from spur tracks onto the main line to first call up the operator at the next station and ascertain from him whether or not the main line might be occupied without delay to trains approaching thereon; that it was the duty of said crew in charge of said engine and coal cars, in the event they pulled out upon the main track, to give notice or warning to the decedent of such fact in time for him to have stopped his train and thus prevented the collision; that defendant was guilty of negligence in the respects mentioned and that decedent was free from contributory negligence.

Defendant contends that the place of the accident was within what was known and designated as "Yard Limits"; that the train driven by decedent was a second-class train; that a rule of the company, with which the decedent was familiar, permitted the main track within yard limits to be occupied by trains, engines and cars, including yard engines and cars drawn by them in their work within yard limits, without reference to the approach of second-class trains or any train other than first-class trains; that the rule also required second, inferior class and extra trains to move within yard limits prepared to stop unless the main track was seen or known to be clear; that the decedent violated this rule, and the accident resulted therefrom; that another rule of the company provided that a signal imperfectly displayed, or the absence of a signal where a signal is usually shown, must be regarded as the most restrictive indication that can be given by that signal; that at the time of the accident there existed to the west of the main track immediately

south of the point where the spur track in question connected with the same, a switch stand between seven and eight feet high, at the top of which were four lamps, two red and two green; that the two red lamps faced in either direction toward approaching trains on the main track when the switch was set for cars coming off of the spur track onto the main line; that the green lights were set in either direction toward approaching trains on the main track when the switch was set for traffic to proceed along the main line; that at the time of the accident the switch was thrown showing a red light facing north towards the train driven by decedent, indicating that the switch was open for traffic off the spur track onto the main line; that the decedent was familiar with this switch signal and knew its location; that he violated the above-mentioned rule in running his train against the red light, whether he saw the same or not; that the red light required decedent to stop his train; that the absence of such signal or the imperfect display thereof likewise required decedent to stop his train before reaching the point where the signal was located; that the violation of said rules, as aforesaid, was the sole proximate cause of the accident, resulting in the death of plaintiff's intestate; that plaintiff's intestate assumed the risk of a collision in driving his train through the yards on the occasion of the accident; that plaintiff's intestate was, in any event, guilty of contributory negligence, requiring a reduction of the damages proportionately, on account of such contributory negligence, under the provisions of the Federal Employers' Liability Act.

The evidence shows that plaintiff's intestate was an engineer on one of defendant's freight trains, which was being driven by him in a southerly direction over defendant's tracks near Freeman, in Williamson county, Illinois; that defendant's railroad operated through Illinois, and on its railroad from Centralia,

Illinois, to Paducah, Kentucky, main line track, hauled freight trains from Chicago to Paducah; that decedent took charge of operating the engine at Centralia; that from Centralia to Herrin, a distance of 53 miles, its right of way which its main line traversed was in part by it designated as railroad yards, continuous with but a few intervals; that from Sesser south to Herrin, a distance of 20 miles, defendant characterized as railroad yards and railroad limits continuously excepting for a few crossings; that the accident happened at Freeman, a station two miles north of Herrin, on the main track of the railroad.

Rules and a time table were introduced to show that this train known as No. 70 was a second class train, which under the said rules, was not entitled to the same right of way as a first-class train. Other testimony showed that this train was a special train and was to run faster than the ordinary second class train.

The evidence further shows that at the time of the accident the deceased was 47 years of age and his family consisted of a wife and three children; that prior to the accident the deceased had worked at Freeman, Illinois, as an engineer operating an engine drawing cars from the adjacent coal mines; that the distance from Centralia to Herrin is about 53 miles; that plaintiff's intestate was in charge of an engine drawing a freight train which ran over this division from Centralia south to the Kentucky line. This train originated in Chicago, and deceased and his crew took charge of the train at Centralia for the run to the finish; that this train was known as the "Hot Shot"; that it was a second class train, inferior to passenger trains, but its time schedule required it to run faster than any train on that division, even faster than the two passenger trains; that the crew were required to operate this train all through the yards from Centralia to Herrin at a speed of approximately 40 miles

an hour; that according to the time table, they were required to maintain an average speed of 34.4 miles per hour; that on the night of the accident the train was three hours late out of Centralia and plaintiff's intestate and his crew were in charge up to the point where the accident occurred, near Freeman; that the accident occurred in the block between Christopher on the north, nine miles from Freeman and Herrin Junction two miles south of Freeman.

The evidence further shows that by the time plaintiff's intestate reached Christopher his train had lost 10 minutes more and he was given a written order at Christopher by the block operator. That order reads as follows:

"No. 70 has rights over all trains North Zeigler Jct. to Neilson and will hold main line at Neilson."

The evidence further shows that plaintiff's intestate received another order or permit card which advised him to expect a light engine in the block known as Extra 803 going south between Zeigler and Herrin; that ordinarily the train which Goodman was on would stop at Christopher, but the operator gave Goodman the signal to continue and not stop, delivering the orders while the train was in motion by means of a hoop, a contrivance used for that purpose; that Goodman continued past Christopher until his train reached Freeman, where it crashed into part of a long train of loaded coal cars that were being drawn onto the main track by another crew; that at the time of the accident no notice or warning of any kind by light, signal or otherwise had been given or communicated to the crew of No. 70 of the movement of this other train on the track.

The evidence further shows that for a period of many years these coal trains came in on the main track at Freeman from these mines, but before coming upon the track it had been the custom or practice to tele-

phone to the operator at the station for information as to traffic before proceeding on to the main track; that telephones had been installed for that purpose; that the foreman of the switch of this coal train crew had done this telephoning for 10 years, several times a day, and never failed to telephone until this one occasion, when he ordered and put this coal train in on the main track without telephoning to find out if there was any other train likely to come along; that there was a switch light at the point where this train was entering the track, but it was so low that the cars moving from the mines hid it from trains coming from the north; that the coal train consisted of 33 loaded cars, an engine and a caboose which was being moved from three to five miles an hour on to the main track; that Goodman's train was supposed to have been moving along between 30 and 35 miles an hour; that the air brakes on the coal train had been connected up and the marker lights—the tail lights on the rear car— put up.

Waring, the conductor on the train on which Goodman was the engineer, testified in part as follows:

"I was up in the cupola looking ahead. I was still looking ahead at the time of the impact or collision. There was no red light on my side. The switches are on the right-hand side. There are two switches which were involved in that movement. I did not see any red light. I did not see any sign of danger at all. I did not see anything unusual at all. If I had, I would have set about warning the crew and the engineer. I, as a conductor, have something to say to the engineer about the speed of the train. There was no occasion to say anything about it on that day. That was the usual and proper speed through that piece of track. . . . The first signal is a distant tower; then the derail board, and then the operators' board that we receive the orders on. In other words, the clearness that night, I could see those boards fully a good mile. I suppose

the head end could see it just as far as I could. Those boards are lighted. The distant board was green. That indicates you have a clear derail. It has two positions, green and yellow. Yellow is the caution. The derail board was green and the home board was red and yellow, that is the board we have to receive the clearance and the orders of before we can pass it. We did not stop at Christopher; we went through at the rate of thirty-five miles an hour. We had no occasion to stop. The operator was out on the platform with his lantern; and the orders were in the hoop and I gathered them. The lights were all in our favor.''

It further appears from the evidence that according to the Rule Book of the company, on page 6 thereof, under the heading of ''Definitions'' appears the following:

''Train.—An engine or motor car or more than one engine or motor car coupled, with or without cars, displaying markers.''

Rule S–71 reads as follows:

''S–71. A train is superior to another train by right, class or direction.

''Right is conferred by train order; class and direction by time table.

''Right is superior to class or direction.

''Direction is superior as between trains of the same class.''

''S–72 is as follows:

''D–72. Trains of the first class are superior to those of the second; trains of the second class are superior to those of the third; and so on.

''Trains in the direction specified by the time table are superior to trains of the same class in the opposite direction.''

Rule D–72 is as follows:

''D–72. Trains of the first class are superior to those of the second; trains of the second class are superior to those of the third; and so on.''

Rule 73 reads as follows:

"73. Extra trains are inferior to regular trains."

Rule 82, which has to do with the movement of trains, reads as follows:

"82. Time-table schedules, unless fulfilled, are in effect for twelve hours after their time at each station. Regular trains more than twelve hours behind either their schedule arriving or leaving time at any station lose both right and schedule, and can thereafter proceed only as authorized by train order."

Defendant contends that the coal train was not a regular train, but merely a switch engine operating in what is known as "Yards." We do not believe the evidence shows that the engine, cars and caboose, all connected together, moving from the side tracks at Freeman, constituted a switch movement as distinguished from a train movement. As was said in the case of *United States v. Chicago, Burlington & Quincy R. Co.*, 237 U. S. 410:

"The work in which they were engaged was not shifting cars about in a yard or on isolated tracks devoted to switching operations, but moving traffic over a considerable stretch of main-line track,—one that was a busy thoroughfare for interstate passengers and freight traffic. . . . trains moving between them are not engaged merely in switching operations, but are engaged in transportation. . . ."

According to the rules of the company, this train was fully equipped as shown by the evidence. *United States v. Chicago, Burlington & Quincy R. Co., supra.*

It is next contended that the intestate, being familiar with the yard, having worked there, should have been on the lookout for the possibility that the said coal train might come out onto the main track. There were no printed rules governing this movement. The custom or practice, however, had been to telephone to the operator at the next station to find out if there would be any danger if the train were to proceed on to the

main track. Intestate would have a right to rely upon this known custom which had the force of rules.

It is the duty of the master to make, publish and enforce reasonable rules and regulations to promote the safety of servants, and as was said in *Yeates v. Illinois Cent. R. Co.*, 241 Ill. 205: "It is the duty of a master conducting a business with different branches, to make, publish and enforce reasonable rules and regulations to promote the safety of servants, but in the absence of any rule governing a particular situation it is proper to consider the existence of an established custom with respect thereto."

Counsel for the defense rely upon Rule 93, which provides as follows:

"93. Within yard limits, the main track may be used clearing first-class trains as prescribed by the rules.

"Second and inferior class and extra trains must move within yard limits prepared to stop unless the main track is seen or known to be clear. Trains carrying passengers must be protected as prescribed by Rule 99."

At Christopher the engineer received an order heretofore set forth, telling him that the track was clear all the way through to Herrin and that he had the right of way. These orders, under the law, took precedence over the rules and it was his duty to obey them. He was far behind in the running time, according to the time table, and it appears they were arranging for him to make this time up by giving him a clear right of way. In order to obey the order he was required to run through the Freeman yard at the speed at which it is alleged he was traveling. Even though the orders which were received by plaintiff's intestate were inconsistent with the rules, it was his duty to obey the specific order given to him rather than the general rule.

As was said in Bailey on Personal Injuries, Vol. 1 (2nd) p. 846:

"It was said if compliance with a general rule is rendered impossible by other and inconsistent orders given by the master to his employees, negligence cannot be imputed to the employee for not following the general rule. This was said and applied where it appeared that an engineer failed to comply with a rule requiring him to reduce the speed of his train, while running through a particular yard, so as to have it completely under control, and it also appeared that this could not be done if he conformed to the time table. It was held that the rule was modified by the time schedule."

In *Hall v. Chicago, B. & N. Ry. Co.*, 46 Minn. 439, the court at page 446 says:

"3. The next point urged is that plaintiff was himself guilty of contributory negligence in not reducing the speed of his train while running through the yard, so as to have it 'completely under control,' as required by the rule; which counsel claims means that the speed must not be greater than that at which the engineer can stop his train within the distance that he can see danger ahead. This rule, like many of the others, does not command the doing or not doing of a particular specific act, but is one calling for the exercise of judgment and diligence on part of the engineer, and must be construed in that view, and considered in connection with the other rules of the company, and the other duties and responsibilities imposed upon engineers. It would seem that the construction which plaintiff himself put upon this rule is a reasonable one; that is, that he should have his train so under control that he could stop it before reaching the danger point, if the proper signals were seasonably given him. But even if the rule, if standing by itself, might mean what defendant claims, yet, as to plaintiff, it was clearly modified by the schedule of time accord-

ing to which these trains were required to be run, and were actually run, presumably with the knowledge and at the direction of the defendant's governing officers. The plaintiff could not conform to the time-table, and at the same time keep his train 'under complete control' in the sense in which defendant claims that term is used in the rules. If compliance with a general rule is rendered impossible by other and inconsistent orders given by the master to his employe, negligence cannot be imputed to the employe for not following the general rule.''

In the case of *Rocco v. Lehigh Valley R. Co.*, 288 U. S. 275, 278, the court said:

''The Court of Appeals held, as a matter of law, that Rocco's negligence was the primary cause of the accident, and therefore the petitioner could not maintain the action. This ruling was made in reliance upon the authorities of which *Davis v. Kennedy*, 266 U. S. 147, *Unadilla Valley Ry. Co. v. Caldine*, 278 U. S. 139, and *Southern Ry. Co. v. Youngblood*, 286 U. S. 313, are typical. These were cases where a member of a train crew was killed as a result of disregarding orders to wait at a given point until a train moving in the opposite direction had passed. In each of them the decedent's negligence was the proximate and efficient cause of the accident; in each it was sought to show that the fatality was in part due to alleged negligence of some other employee in omitting to give the decedent an order which would have reminded him of the orders previously given and by which he was bound. In none was there any negligence on the part of employees operating the train moving in the opposite direction, with which the collision took place.''

In the case of *Grand Trunk Western Ry. Co. v. Lindsay*, 201 Fed. 836, at page 844, the court said:

''It is only when plaintiff's act is the sole cause—when defendant's act is no part of the causation—that defendant is free from liability under the act.''

It is next contended that plaintiff's intestate violated Rule 27, which rule provides that the absence of a signal must be regarded as the most restrictive indication. The evidence shows that there were no signals of any kind indicating this coal train was being moved on to the track. The only signs or signals visible were the high signals or tower signals which indicated a clear track. Many of the coal cars making up this coal train from the mines were what is termed "high hoppers," and, because of their height, the testimony shows that if there had been a red light displayed it would have been impossible for a person to see it from a train approaching from the north. We can scarcely believe that these switch lights were put there for the purpose of warning approaching main line road trains of danger. For, if they were to be used for that purpose, then they were placed in such a position that whenever danger was present, and they were needed most, that is when a train was using the switch to or from the coal mines, the lights could not be seen by a southbound train.

In the case of *Fisher v. Chicago, R. I. & P. Ry. Co.,* 290 Ill. 49, it was said:

"Although the negligence of a locomotive engineer in failing to observe that there was no light at a closed switch leading to a turn-table may have been a proximate cause of the accident resulting in his death, such negligence is not the sole proximate cause where it is proved that the agents or employees of the railway company failed to perform their accustomed duties of opening the switch and lighting the signal lamp on the switch-stand."

Had it been defendant's intention to rely upon these switch lamps to give notice to an approaching train as to whether or not the track was being used, it was defendant's duty to have the lamps placed at a sufficient height so that such light or lights could be readily seen

by the engineer on an approaching train under any and all circumstances.

Complaint is made that the court did not instruct the jury as a matter of law that the defendant was not guilty. In order to do that the court would have had to say that the actions of the plaintiff's intestate alone were the sole proximate cause of the accident, which from the facts herein disclosed, he would not be justified in doing.

We do not believe the court committed any error in refusing to instruct the jury at the close of plaintiff's case or at the close of all the evidence and we are of the opinion that this was a proper case to submit to the jury on all the facts.

Further complaint is made as to some of the other instructions given on behalf of plaintiff, but after carefully examining them and without discussing each one in detail, we believe the jury was fairly instructed as to the issues.

At the time of his death the deceased left surviving him Ruby R. Goodman, his widow, Janis M. Goodman, his daughter, and Howard E. Goodman, his son. When the jury returned their verdict they found that the defendant was guilty and assessed the plaintiff's damages at $30,000 and of this total amount, they found that Ruby R. Goodman, the widow, sustained damages in the sum of $15,000; that Janis M. Goodman, the daughter, sustained damages in the sum of $5,000 and that Howard E. Goodman, the son, sustained damages in the sum of $10,000, making plaintiff's total damages $30,000.

At the time the jury retired the court gave to the jury a special interrogatory at request of defendant to be answered by them, which reads as follows:

"The jury will, from the evidence and under the instructions of the Court, answer the following question

by writing under the same, in the space provided therefor, your answer:

"Question: If from the evidence, and under the instructions of the court, you find that the plaintiff is entitled to recover, and further find that the deceased was guilty of negligence in the operation of his train, at and before the time of the happening of the collision resulting in his death, and that his negligence, if any, in this respect directly contributed to cause or bring about the collision in question and his resultant death, then state what sum you deduct by way of damages on account of said decedent's contributory negligence.

"Answer: Twenty Thousand Dollars."

Plaintiff objected to the giving of the above interrogatory to the jury on behalf of defendant, and we think rightfully so. The purpose of giving a special interrogatory is to ask the jury to decide some controlling question in the case which, if returned in the affirmative, would control the general verdict. In *Chicago & A. R. Co. v. Harrington,* 192 Ill. 9, at page 32 the court said:

"This interrogatory was properly refused, because an affirmative answer to it could not have controlled a general verdict had it been in favor of appellee."

In addition to that the interrogatory asked the jury to state the amount they "deduct" by way of damages. As the Supreme Court of the United States said in the case of *Seaboard Air Line Ry. v. Tilghman,* 237 U. S. 499, at page 501:

". . . where the causal negligence is attributable partly to the carrier and partly to the injured employe, he shall not recover full damages, but only a diminished sum bearing the same relation to the full damages that the negligence attributable to the carrier bears to the negligence attributable to both; the purpose being to exclude from the recovery a proportional

part of the damages corresponding to the employee's contribution to the total negligence.''

When the interrogatory asked the jury ''how much they deduct'' it was confusing and misleading and should not have been given. In addition to that, if the jury had intended to find that plaintiff's intestate was guilty of contributory negligence to the extent of $20,000, such finding would have been against the manifest weight of the evidence.

As was said in the case of *Norfolk & Western Ry. Co. v. Earnst*, 229 U. S. 114, at page 120: ''If the defendant relies upon the defense of contributory negligence, the burden is upon it to establish that defense by a preponderance of the evidence.''

In this case defendant failed to prove contributory negligence on the part of plaintiff's intestate and any such finding, if it had been made by the jury, should have been set aside by the trial court as being against the manifest weight of the evidence.

It is contended that the verdict is excessive. The jury apportioned the damages as follows:

$15,000 to the widow;

5,000 to the 16-year-old daughter, and

10,000 to the 4-year-old son.

The evidence presented here shows that during the last year of Goodman's life he earned and was actually paid the sum of $2,331.25, and that he spent all his earnings on his family; that the expectation of life at 47 years of age is 22.83 years, and on that basis his future earning capacity was slightly more than $53,000. The jury had been instructed in effect by the court that as to the pecuniary contributions which the widow and children of the deceased might reasonably have expected from him, had he not been killed, the jury should allow the present cash value and in determining this present cash value, the jury should take into consideration ''the highest rate of interest at which

money presently paid to the plaintiff might be, with reasonable safety, invested.''

The amount the widow and children would have received, based on his annual earnings, as shown by the record, had he lived, would have been approximately $50,000.

In the case of *Norfolk & Western Ry. Co. v. Holbrook,* 235 U. S. 625, the court said:

''In the present case there was testimony concerning the personal qualities of the deceased and the interest which he took in his family. It was proper, therefore, to charge that the jury might take into consideration the care, attention, instruction, training, advice, and guidance which the evidence showed he reasonably might have been expected to give his children during their minority, and to include the pecuniary value thereof in the damages assessed.''

We do not believe the damages fixed by the jury were excessive.

From a careful review of this record, we do not believe that the evidence does other than find for the plaintiff and the proof shows that the jury was justified in arriving at its verdict and the court properly overruled the motions for a new trial and entered judgment on the verdict.

For the reasons herein given the judgment of the superior court is hereby affirmed.

*Judgment affirmed.*

HEBEL and HALL, JJ., concur.