Kathryn Paul, Administratrix of Estate of Clarence Lee Paul, Deceased, Appellee, v. Leroy Garman and Bernice Garman, Appellants.

Gen. No. 9,651.

Opinion filed April 25, 1941. Rehearing denied June 23, 1941.

FRANK A. KERR, of Mount Morris, and JAMES A. PENNY, of Rockford, for appellants; HALL & DUSHER, of Rockford, of counsel.

MARTIN V. PETERMAN, of Oregon, B. JAY KNIGHT, J. E. GOEMBEL and FREDERICK H. HAYE, all of Rockford, for appellee.

Mr. Presiding Justice Wolfe delivered the opinion of the court.

The plaintiff is the administratrix of the estate of Clarence Lee Paul. While engaged in repair work on a public road at a place about one and one-half miles north of the town of Mount Morris, Illinois, Paul was killed on October 2, 1939, by being hit by the automobile of the defendant, LeRoy Garman, which was being driven by his wife, Bernice Garman, who is also a defendant to the suit. It is conceded by the defendants that Bernice Garman was acting as the agent of her husband at the time of the accident.

The suit seeking damages for the death alleged to have been caused by the negligent operation of the automobile by Bernice Garman, was tried before a jury which rendered a verdict of $10,000 in favor of the plaintiff against both defendants. From a judgment entered in that amount, the defendants have appealed.

There are several counts in the complaint charging the defendant, Bernice Garman, with the negligent operation of the automobile. The second count of the complaint is a wilful and wanton count and attention is called to the charging part of that count, which in substance alleges, that on October 2, 1939, Clarence Lee Paul was employed by the Rock Road Construction Company as a laborer on a certain road construction project which the said company had contracted to build; that said project consisted of the surfacing of a public road running north from the city of Mount Morris; that as part of his duties, Paul was assigned to checking loads of gravel as they were dumped by trucks upon the road; that on October 2, 1939, Paul was so engaged in checking loads of gravel dumped on the road at a point about one and one-half miles north of Mount Morris; that trucks were driven on the road from the north toward the place where gravel had been previously dumped, turned around in the road so that

they were backed in a southerly direction, and headed in a northerly direction. That, as the gravel was dumped, it was the duty of Paul to take from the driver of each truck, a card and to mark the card with the amount of gravel dumped from the truck; that about 6:30 o'clock p.m., on October 2, 1939, Paul was standing at the westerly side of one of the trucks, as it was standing in the center of the road; that at said time the left door of the driver's cab of the truck was open; that the door was hung from hinges at the front of the cab; that at that time, Paul was standing between the door and the side of the truck; that it was dark, and the truck had its lights burning; that at the same time, another truck was parked in the center of the road a few feet north of the truck near which Paul was standing, which latter truck had its lights burning; that the lights of both trucks were visible for a long distance to persons coming from the north; that Bernice Garman was at that time, driving a Ford panel truck in a southerly direction on the road; that as she drove along the roadway, she knew that the roadway was under construction; that she saw the lights of the two trucks parked in the center of the roadway; that there was, to the west of the trucks, approximately eight feet of level ground on which an automobile could be driven with safety.

It is further alleged that it was the duty of Bernice Garman, as she was driving there, to drive at a speed reasonable and proper, and it was her further duty to so drive, operate, manage and control the automobile she was driving so as to have it under control, so as not to injure Paul, as he was lawfully upon the highway there; that notwithstanding her duties, the defendant, Bernice Garman, did wilfully, wantonly and maliciously drive toward said trucks at a high and dangerous rate of speed, to-wit: 50 miles per hour; that as she approached the most northerly of said trucks, she took her foot off the accelerator of her

automobile, but at no time did she apply the brakes of said automobile; that as she passed the most northerly truck, she increased the speed of her automobile and drove it upon and against Clarence Lee Paul, as he was standing beside the most southerly of said trucks, and upon and against the open door of the most southerly truck.

The answer of the defendants denied every allegation of negligence, and of wilful and wanton misconduct, admitting, however, the allegation that the accident happened in the night when it was dark. The answer was amended by charging the plaintiff's intestate with wilful and wanton misconduct in stepping out directly into the path of defendant's automobile, without warning, and without looking.

The jury answered in the affirmative, a special interrogatory of the plaintiff. Was Bernice Garman guilty of wilful, wanton and malicious misconduct in the operation of the automobile of LeRoy Garman, just before and at the time of the accident? A special interrogatory of the defendants asking if Clarence Lee Paul, just before, and at the time of the accident, was guilty of wilful and wanton misconduct, which was the proximate cause of his own death, was answered by the jury in the negative. Instructions were given on behalf of the plaintiff defining wilful and wanton misconduct, and if the jury found Bernice Garman guilty of wilful and wanton misconduct in the operation of the automobile she was driving at the time of the accident, contributory negligence of the plaintiff's intestate, if any, would not constitute a defense to count two of the complaint.

At the trial, timely motions were made by the defendants for a directed verdict, *seriatim,* as to each particular count of the complaint. Defendants' motion for a new trial, among other grounds, relied upon the failure of the court to direct a verdict for the

defendants as to count two. Motions were made by the defendants to set aside the special findings of the jury; and the refusal of the court so to do was assigned as a reason for a new trial, on the ground that the findings, and each of them, are against the manifest weight of the evidence.

It is contended by the defendants that there is no evidence in the record to support the wilful and wanton charge of count two, and that the refusal of the court to withdraw the count from the jury is error, as a matter of law, requiring a reversal of the judgment and a remandment of the case for a new trial. The rule of practice stated in this contention is found in the case of *Greene v. Noonan,* 372 Ill. 286, which is cited by them in their brief. We quote from that case where the complaint contained counts charging negligence, and also a wilful and wanton count. "A defendant in a case of this character, facing a charge of wilful and wanton conduct, is placed at a serious disadvantage as compared with one charged merely with negligence, and where there is no evidence to support such charge, it is the court's duty, on motion, to withdraw such charge from the jury, and failure so to do is, by reason of the character of the charge, error requiring reversal of the judgment, for no one may know what influence the charge, though not proved, may have had upon the jury, particularly since it has not been informed that it was not to be considered by it. The distinction in law between wilful and wanton conduct and mere negligence is not a matter with which the average juror is familiar. We are of the opinion that the refusal to withdraw from the jury, on appellants' motion, the consideration of the wilful and wanton charges, requires a retrial of the cause." It is also true that if there was no evidence from which the jury could find Bernice Garman guilty under the charge of wilful and wanton misconduct of

count two of the complaint, it was error to submit to the jury the special interrogatory of the plaintiff. (*Nosko v. O'Donnell*, 260 Ill. App. 544.)

October 2, 1939, Clarence Lee Paul, was in the employ of a firm of contractors which had a contract with the public authorities to haul and spread gravel on the road. The road extends north from the town of Mount Morris to the city of Rockford. On that day employees of the road contractors began hauling and dumping gravel on the road. The gravel was loaded into automobile trucks about seven to eight miles north of Mount Morris, and then hauled over the road southward where it was deposited on the road at a point immediately north of the gravel, which had been placed on the road during the day. The work on the road was progressing from the south toward the north. When a truck came near the place where gravel was to be dumped on the road, it was turned around by the driver and propelled backwards, stopped and emptied on the road in front of the newly placed gravel.

In designating the job of the plaintiff's intestate during the road repair work, the witnesses referred to him as "a checker." It was part of decedent's work to check the loads when they arrived at the dumping place by taking a ticket from the driver, place it over a ticket which decedent had bearing the name of the driver, and then punch both tickets.

At evening on the day of the accident, the road had been thus improved to a place about one and one-half miles north of Mount Morris. At that time, it was nearly dark and the headlights on the trucks hauling gravel were lighted, as they were being driven from the base of supply to the dumping place on the road. Two of the loaded gravel trucks arrived there about 6:30 o'clock p. m. One of these trucks, a Diamond-T, was being driven by the witness, Anthony N. Black; the other, a smaller truck, was being driven by the witness, Dudley McDonald.

Black was the first one of these drivers to arrive at the place where the gravel was being spread on the road. Following the usual practice, Black some distance from the freshly placed gravel in the road, turned his truck around and backed it toward Paul who was standing in the middle of the road by the gravel to indicate where the truck was to be stopped and unloaded. During this operation, Black opened the door on the left side of his truck, and leaned out of the open door in order to see Paul, and guide the truck toward him. When Black had his truck stopped in place to unload it, or very shortly before, McDonald arrived there, turned his truck around and backed it about 18 to 20 feet just in front of the truck in charge of Black. Paul, at this time, walked from the road back of the Black truck to the door of this truck on its left side; Black with his left arm reached for a rope on his truck, which is used to start the operation of the hoist, which elevates the forepart of the truck bed. With his right hand, he gave Paul his load ticket. Paul took the ticket and then passed in front of Black's truck to the headlight on the left side of the truck. Underneath the light cast by this headlight, Paul found the ticket in his possession bearing the name of Black, and placing this ticket over the one given to him by Black, punched both tickets.

After punching the tickets, Paul walked to the open door of the Black truck, on its west side, to hand Black his load ticket. Paul was then standing facing the south, and about to turn from the outer edge of the open door toward Black, who was seated in the truck with his hand extended to receive the ticket. At this moment the defendant, Bernice Garman, traveling on the road southward in her husband's panel Ford truck to Mount Morris, drove the truck against the door of the gravel truck in charge of Black. The door was supported by hinges, which permitted it to be swung toward the front of the truck. The impact of the Ford

truck against the door of the gravel truck forced the door violently against Black's wrist. No one saw the movement of Paul after the door was hit. Paul was found on the road 18 to 20 feet from the door of Black's truck in an unconscious condition. He was taken to Dr. DuMont's office in Mount Morris where he was given first aid treatment. The doctor testified that upon examination of Paul, he found that his left leg and right arm were fractured, and that his face and scalp were badly cut. Paul was removed to a hospital in Rockford where he died four or five days after the accident as a result (it is conceded by the defendants) of the injuries he received in the accident.

It is stated in the case of *Bernier v. Illinois Cent. R. Co.*, 296 Ill. 464, that, "It is difficult, if not impossible, to lay down a rule of general application by which we may determine what degree of negligence the law considers equivalent to a willful or wanton act. Whether an act is willful or wanton is greatly dependent upon the particular circumstances of each case." If there is any evidence in the case supporting the charge of wilful and wanton misconduct, the question whether any injury has been inflicted by wilful and wanton misconduct, is a question of fact to be determined by the jury. (*Bernier v. Illinois Cent. R. Co., supra.*) The particular facts and circumstances of the accident in the present case must be ascertained from the testimony to determine if there is any evidence tending to prove the wilful and wanton charge of count two of the complaint, and consider whether or not there is any evidence which, with all reasonable inferences to be drawn therefrom, will support the verdict. We must assume the evidence favorable to the plaintiff to be true, and view it in a light most favorable to the plaintiff. (*Darmody v. Kroger Grocery & Baking Co.*, 362 Ill. 554.)

Before stating the testimony bearing particularly on the alleged wilful and wanton misconduct of the de-

fendant, Bernice Garman, it should be understood that we have two questions before us: First—Is there any evidence proving the wilful and wanton count, and second—Is the verdict based on the wilful and wanton count contrary to the manifest weight of the evidence? (*Greene v. Noonan, supra; Barthelman v. Braun,* 278 Ill. App. 384; *Rhoden v. Peoria Creamery Co.,* 278 Ill. App. 452.) There was contained in the special interrogatory submitted by the plaintiff, the query, whether the plaintiff proved by a preponderance of the evidence, that Bernice Garman was guilty of wilful and wanton misconduct, as charged in the second count of the complaint. The affirmative answer to the special interrogatory of the plaintiff is binding on the trial court (upon the defendants' motion to set it aside,) unless it is not supported by any evidence, or unless it is against the manifest weight of the evidence. In view of the law of Illinois relative to the effect of a verdict finding the defendant guilty of wilful and wanton misconduct, and the decision in *Greene v. Noonan, supra,* the answer of the jury to the special interrogatory of the plaintiff should not be permitted to stand if it is against the manifest weight of the evidence.

The plaintiff's case rests on the testimony of Mrs. Garman, Black and McDonald who were called as witnesses by the plaintiff. Mrs. Garman was called by the plaintiff under section 60 of the Practice Act. After her testimony tending to prove the charge of the complaint that she was acting as the agent of her husband at the time of the accident, the plaintiff cross-examined her relative to her driving the Ford truck when the collision occurred, and about other facts and circumstances of the accident. She had testified at the coroner's inquest concerning the cause of Paul's death, and the plaintiff used her testimony before the coroner for the purpose of impeaching her. She also testified on her own behalf after the plaintiff rested her case.

When examined by counsel for the plaintiff as a witness called under section 60 of the Practice Act, Mrs. Garman testified substantially as follows, so far as her evidence is material to the questions now being considered by the court. "For a good quarter of a mile I could see that there were two vehicles of some kind there in the road. I met an automobile forty rods ahead of the first standing car, and after I passed this automobile the lights of the two cars were shining in my eyes to blind me. The headlights of the two cars seemed real bright to me; they blinded me from the first time I saw them. I was going about forty miles an hour when I met the automobile and slowed down to about thirty miles an hour as I passed it, and I was going about thirty miles an hour when I got to the first truck. Did not put on my brakes as I drove the forty rods toward the trucks. I noticed that the first vehicle was a truck as I went by it. Did not put on gas and speed up as I went by first truck. When I got to the last one, as I started to speed up, and moved my foot over, I heard the click. I saw the second truck, and as I got opposite the front end of it, I could see nothing in my pathway. I do not know how close I drove to the front end of that truck. There was room for one car to pass. I had not increased the speed of my car; I was going to do so. The second truck was about twenty feet south of the first truck; I could see the second truck after I got past the first one. The lights on the second truck blinded me. I could see just the lights on the second truck, and the end of the front fender. I could not see that the door of the second truck was open." During this examination it was brought out that at the coroner's inquest that she testified that she dimmed her lights as she passed the automobile traveling north; that she saw the other two cars and thought they were coming toward her. That she drove over on her side of the road.

Anthony N. Black testified that his truck was standing in the middle of the road. The headlights on his truck were burning. That there were three kinds of lights on his truck—the first turn of a switch bringing on the road lights, a second turn, bright lights, and pressure on a floor button turning on the real bright lights. That when his truck was standing there at the time of the accident, the headlights were on "road lights, which shine dim." That just before the door was slammed, Paul was standing even with the open door ready to hand his ticket to him. The door was of steel and in perfect condition before the collision; that afterwards, the door was sprung and its side bent in, about six or seven inches. That he did not see the Garman car before the accident. On cross-examination he testified that with the road lights on, a driver of his truck could see 15 to 20 feet ahead of the truck clearly.

McDonald testified that the lower beam of the headlights of his truck were on while it was standing in the highway in front of the truck in charge of Black. That he did not see the Garman car coming from the north, but that he saw it as it passed him, as he sat in his truck; that he just got a glimpse of the car, as it passed him; that in his opinion the car, as it passed him, was going 40 to 50 miles an hour; that he had no difficulty seeing objects at the time without lights.

It cannot be fairly said from Mrs. Garman's testimony that it was proved by the plaintiff that she saw the decedent, Paul, standing by, or behind the open door of the truck before she drove her car against the door. It is gathered from the evidence that at the time of accident, it was twilight; as expressed by one of the witnesses, "it was deep dusk." Paul was five feet and ten inches in height, weight about 165 pounds. On that evening he was wearing overalls, a blue shirt and gray sweater. Mrs. Garman testified that she thought she had clipped the bumper of the second truck, and

did not think she had done any damage. She stopped her car two or three telephone poles from the standing trucks, returned to the place of the accident, and offered to take Paul to a hospital.

It appears from the evidence that Mrs. Garman saw the trucks in the middle of the road as she approached them in her car at a distance of a quarter of a mile. She retarded the speed of her car to 30 miles an hour, while passing an automobile, and she was going at that rate of speed,—as she came toward the trucks—for a distance of 40 rods. It was not dark at that time. We do not think it unreasonable to draw the inference from the evidence, at the close of the plaintiff's case, that the defendant, Bernice Garman, was aware that the two vehicles were standing in the middle of the highway, as she drove toward them from a distance of a quarter of a mile. She did not use the brakes on the car she was driving while traveling 40 rods toward the trucks, and passed them at the rate of 30 miles an hour, according to her own testimony. The speed of her car when she passed the first truck, as testified to by McDonald, was between 40 and 50 miles an hour. She drove toward and passed closely by the trucks while she was blinded by these headlights, and she could not see whether or not there was anyone by the side, or about the trucks. It seems to us she drove without taking any precautions to avoid injury to a person about the trucks.

It is the duty of an operator of an automobile to keep a lookout for vehicles standing in the highway (42 C. J. p. 1016; *Collins v. McMullin,* 225 Ill. App. 430; *James v. Motor Transit Management Co.,* 260 Ill. App. 246; *Hogrefe v. Johnson,* 271 Ill. App. 469). And when approaching such vehicle it is the duty of the operator of an automobile to observe whether there are any persons about the vehicle, and use reasonable care to avoid injuring them. (42 C. J. p. 1017; 34 A. L. R. p. 1513, and cases there annotated.) Where the driver

of an automobile is blinded by the lights of another car and continues in his course and strikes a person to whom he owes the duty of exercising reasonable care to avoid injuring him, it is a question for the jury to decide whether the driver of the car was guilty of negligence. (*Wedig v. Kroger Grocery & Baking Co.,* 282 Ill. App. 370, and cases there cited.)

Assuming, as we must, that the evidence in the record, at the close of the plaintiff's evidence, is true and viewing this evidence in a light most favorable to the plaintiff, with all inferences which may reasonably be drawn from that evidence, it cannot be said as a matter of law, that there is no evidence proving the wilful and wanton count of the complaint. (*Darmody v. Kroger Grocery Co., supra.*)

There was no evidence introduced by the defendants materially contradicting the testimony of the plaintiff's witnesses. We are bound by definite rules governing the disturbing of a verdict. (*Corcoran v. City of Chicago,* 373 Ill. 567, 569.) The verdict is not against the manifest weight of the evidence. The answer of the jury to the special interrogatory of the plaintiff, is not against the manifest weight of the evidence.

At the request of the defendants the court submitted to the jury the special interrogatory whether the decedent, Paul, was guilty of wilful and wanton misconduct which proximately contributed to his death. The answer of the jury is in the negative. Whether an act is wilful and wanton is greatly dependent upon the particular circumstances of each case. It is the peculiar province of a jury to weigh and consider. (*Rohrer v. Denton,* 306 Ill. App. 317.) It is clear that it cannot be said that the answer of the jury to this interrogatory is against the manifest weight of the evidence.

In the case of *Carneghi v. Gerlach,* 208 Ill. App. 340, page 345 it is stated: ''It must be remembered that

the sweeper was rightfully in the street, at the place where he was at work, and as to whether or not he was guilty of any negligence because his attention was on his work and not on the approach of appellant's car, or because, at that time, he had his back to appellant's car while performing his work on the street, were all questions for the jury to determine; but he had a right to rely on the fact that the drivers of the automobiles using the street, who had knowledge of his presence and saw him at work, would exercise reasonable care in managing their automobiles not to injure him." (See also, *Leoni v. McMillan,* 287 Ill. App. 579.) This latter statement we may supplement by saying that plaintiff's intestate had a right to rely on the fact that drivers of automobiles using the highway would use reasonable care in keeping a lookout for standing vehicles on the highway, and exercise reasonable care to avoid injury to persons about the vehicles.

It is contended by the defendants that plaintiff's counsel made improper argument to the jury, and persisted in doing so over the objections of the defendants. It is urged that counsel for plaintiff attempted in his argument, "to have the jury place themselves in the position of one of the parties to the suit"; also, that plaintiff's counsel persisted in seeking to bring before the jury assumed facts not proved by the evidence, with intent to influence the jury improperly. The entire argument of counsel for the plaintiff to which the objections are made, appears in the additional abstract of the record. We have examined the argument and considered the objections made thereto by counsel for the defendants. The objection that the plaintiff's attorney attempted in his argument to have the jury place themselves in the place of a party to the suit is not well founded. We are of the opinion that no substantial error was committed by the court in refusing a new trial, on the ground that plaintiff's attorney made improper argument to the jury. The

matter is one which must be left largely to the sound discretion of the presiding judge, to decide, under all the circumstances of the case in view of the remarks preceding the argument objected to and the temper and character of the jury, whether or not a new trial should be. granted for the misconduct of counsel by way of improper argument to the jury.—*Chicago City Ry. Co. v. Creech,* 207 Ill. 400.

It is contended that the court erred in refusing to give defendants' instruction number 2, which defined contributory negligence. The substance of this instruction was given in other instructions. As the jury by its answer to plaintiff's special interrogatory found the defendant, Bernice Garman, guilty of wilful and wanton misconduct, the court did not err in refusing to grant a new trial because of the denial of this instruction. Other objections are made by the defendants to instructions given for the plaintiff, but it is our opinion that viewing the instructions as a series, there is no reversible error in the instructions.

It is contended that the damages awarded by the jury are excessive. At the time of his death Clarence Lee Paul was just past 31 years of age. He left surviving as his heirs, his wife and four children, the oldest of whom was 11, and the youngest 7 years old. He was strong and healthy, and was farming a large farm as a tenant; his wage as a checker when he was killed was 50 cents an hour. His expectancy of life was 29.83 years. There is evidence in the record from which it could be deduced, or estimated, that his gross annual income was between $1,500 and $2,000. As is stated in the case of *Hartray v. Willett Co.,* 232 Ill. App. 193, 220: "In case of a husband's death, through another's negligence, such damages are allowed as are equivalent to the pecuniary loss thereby sustained by the decedent's wife and children; the amount, in all probability he would have earned by his work during the rest of his life, estimated as probable, and which

would have gone to the benefit of his wife and children.'' Considering the elements which are to be considered, and as they here appear in evidence, in awarding damages for wrongful death, we do not consider the amount of the verdict excessive.

It is also contended by the defendants that the plaintiff's counsel unfairly and prejudicially used the testimony given by Bernice Garman before the coroner to impeach her evidence when she testified as a witness called by the plaintiff, under section 60 of the Practice Act. Defendants complain that plaintiff's counsel did not read to her, while so attempting to impeach her evidence, the whole of each of her answers made at the coroner's inquest, but only part of such answers. After counsel objected to this method of examination, plaintiff read again part of an answer of Mrs. Garman before the coroner. Upon objection being again made by counsel for the defendants, plaintiff's attorney read the whole of her answer made at the coroner's inquest. We have examined the record in light of these objections made by the defendants, and there is not reversible error in the record as contended by them.

There being no reversible error in the record and finding, as we do, that the verdict of the jury is not against the manifest weight of the evidence, the judgment of the circuit court is affirmed.

*Affirmed.*