### Susie F. Young, Appellee, v. Illinois Central Railroad Company, Appellant.

### Gen. No. 9,361.

Opinion filed May 27, 1943.

STONE & TAYLOR, of Bloomington, for appellant; VERNON W. FOSTER, CHARLES A. HELSELL and J. W. FREELS, all of Chicago, of counsel.

CASSELS, POTTER & BENTLEY, of Chicago, for appellee; RALPH F. POTTER, L. H. VOGEL and FRED W. GIESEKE, JR., all of Chicago, of counsel.

MR. PRESIDING JUSTICE RIESS delivered the opinion of the court.

The defendant, Illinois Central Railroad Company, has perfected an appeal to this court from a judgment in the sum of $2,500 which was entered in favor of plaintiff appellee, Susie F. Young and against the de-

fendant company after trial and verdict by a jury in the circuit court of McLean county. Plaintiff alleged that she had sustained injuries and resultant damages by falling down two intervening steps between the floor levels of adjoining toilet and wash rooms, negligently constructed and maintained by the defendant company for public use in its railroad passenger depot in the city of Chicago. Motions for a directed verdict of not guilty were interposed by defendant and denied by the court at the close of plaintiff's evidence and of all of the evidence. Motions by defendant for judgment notwithstanding the verdict and for judgment on special findings alleged to be inconsistent with the general verdict were also denied. Subsequent motions to set aside the verdict and grant a new trial were filed by both parties and overruled by the court. Errors in adverse rulings on such motions and in entering judgment on the verdict were assigned by defendant and cross-errors were assigned by plaintiff, the latter contending that the amount of the verdict was inadequate and that the court erroneously gave or refused to give certain indicated instructions to the jury.

The complaint alleged in substance that while the plaintiff was waiting for her train in the Twelfth Street Passenger Station of defendant company in the city of Chicago, she "slipped, or tripped or fell" on the stairway in question and received serious and permanent injuries to her spine. Paragraph 5 of the complaint alleged specific negligence as follows: (a) negligence by defendant in failing to maintain a continuous floor, ramp or other safe device instead of stairsteps between the floor levels; (b) in permitting said stairs to become worn, slippery and unsafe for use; (c) in failing to provide handrails or other supports upon or at the side of the stairs or risers; (d) in not equipping said stairs with cleats, mats or other covering providing safe footholds thereon; (e) in failing to provide adequate and properly placed windows,

lights or lighting fixtures for proper illumination of said stairs for the safety of persons using the same; (f) in otherwise so negligently and carelessly maintaining and operating said stairs or risers that plaintiff was caused to and did step or trip or fall as aforesaid; thereby proximately causing plaintiff's fall and injuries while she was in the exercise of due care for her own safety. At the close of the evidence, the plaintiff dismissed the allegations of negligence set forth in the above subparagraphs (b) and (d).

Special interrogatories were submitted to the jury concerning the three remaining specific charges of negligence, in answer to which the jury found by their special verdicts that the defendant was not negligent (a) in constructing stairsteps instead of a continuous floor, ramp or other device; (e) that the defendant had not failed to provide proper illumination for the stairs. (f) To the interrogatory "Was the defendant negligent in failing to provide handrails or other supports upon or at the side of stairs or risers?", the jury answered, "Yes." A general verdict was also returned by the jury on February 7, 1942, as follows: "We, the jury, find the issues for the plaintiff herein and assess plaintiff's damages in the sum of Twenty Five Hundred Dollars ($2500.00)", and upon that verdict, the judgment was entered.

It appears from the evidence that on October 18, 1939, the plaintiff drove in her own automobile from her home in Bloomington to Kankakee from where she rode with friends or relatives into Chicago. On October 20, after spending the day with a nephew in the Marshall Field store, the plaintiff went to defendant's railway station at about 4 o'clock p. m., and purchased a passenger ticket to Kankakee, Illinois, after which she and her nephew went to the second floor waiting room. Shortly before 5 o'clock p. m., plaintiff went alone to the adjacent women's rest rooms. The outer

rest room is of dimensions of 15 by 17½ feet and is designated as the wash room or "powder room." It contains 6 wash basins and mirrors, of which 3 are located along the east wall on each side of the steps which lead upward from the floor level of the wash room for a height of 1 foot 4⅝ inches to the floor level of the open doorway and floor of the adjoining toilet room; the latter having dimensions of 17½ by 19½ feet. The 2 intervening steps extend across and directly in front of said doorway and frame and between the ends of the wash basins and supporting upright legs thereof, which are located along and adjacent to the wall on each side of the steps and the white door frame as shown on plaintiff's 3 photographs and defendant's plat drawn to scale, all of which were admitted in evidence as exhibits without objection as portraying the stairway and surroundings shown thereon. Each step between the 2 floor levels rises 5½ inches in height; the oak tread of the lower step being of a depth of 13 inches and the upper step tread being 12 inches in depth. The length of the steps are approximately 4 feet, extending entirely across and some inches wider than the door opening and partly across the width of the door frames on each side. From the center of the white painted ceilings in each of the 2 rooms, at a height of approximately 8 feet above the floor, 200 candle power electric light bulbs were suspended in and partially inclosed by inverted translucent glass bowls, each being 4½ inches deep by 10 or 12 inches in diameter. Six light bulbs of 75 to 100-watts each were also suspended above the partitions between the 12 toilet booths or stalls which were 6 feet in height and fitted with the usual type of swinging doors. Six of the booths were located on each side of the toilet room. There was an open areaway between the booths extending from the entrance doorway and steps to the rear or east wall of the toilet room, in

which outer wall 2 windows shown on the plat are located. There were also 3 window sections located along the north or outer wall of the wash room.

Plaintiff, then aged 69 years, testified that "just a little before train time" she had gone to the dressing room and had walked up these steps from the wash room into the toilet room where she remained for a space of 7 to 10 minutes; that she then came out to go down and "I just stepped down like I was going to step down and there was no step there. I just went head over heels." Plaintiff further testified that she wore bifocal glasses at the time but that her eyesight was "as good as it is now"; that the lower room was well lighted by light and windows but the upper room was dark and "as I walked to the doorway or to the entrance the light came right down this way on my face. I'll tell you, I stepped off. I supposed I was going to step off and there was nothing there and I grabbed for the rail and that threw me—there was no rail there." Question: "Had you observed that as you went up into the upper rooms?" "No, I never had observed going up, when I seen I was going to fall I grabbed for the rail but there was none there, I fell with my head toward the north, my face toward the east and on my left side, shoulder and arm." She then described her alleged resultant injury and treatment to her spine and back following the alleged fall and injury. On cross-examination she said that "It seemed there was a window to the north, and then there was a flickering light some place above. I don't know where. When I fell, I don't know whether there was a light or not." She didn't have a sensation of "tripping or slipping." That she just went on and missed the steps for some reason. "I guess I just went right off." Plaintiff stated that when she was a girl she used to go into this station but not in recent years; that the wash room was lighted but when she went back into the lavatory it was not lighted; that she

did not know how the wash room was lighted and didn't notice where the lights were; "I walked up these stairs. The room into which I went was not well lighted. There was a globe something like that just in the middle, just one in the middle where the lavatories were." She stated that she saw no window after she got up the step, if there was she didn't notice it nor did she notice the row of lights along the booths; that she did know that she was going up the stairs. When asked as to whether she noticed anything the matter with the stairs as she went up, she stated that she didn't even think of it; that when asked if she knew she was going to come down those stairs, she answered "Yes, but I stepped right off into the air"; that "I put my foot down but the step wasn't there and then I reached for the handrail and it wasn't there"; she then answered to the question that she discovered there was a step there, "I guess there was, I didn't think I took it with me, Mr. Stone." To the further question as to whether she had not stepped in the right place and had missed the step, she answered, "Well, I'll tell you. I went off just like this, Mr. Stone (indicating); clear up like that. I suppose there was a step down there, but I just walked right over that." Asked if she was looking down at the steps—where she was going, she replied "Yes, I suppose I was. You know you don't think of those things."

From the evidence and exhibits, the presence of the white door frame clearly appears at the top of the shallow steps which plaintiff might, by the ordinary use of her faculties, have grasped or held with her hand before or when stepping outward and downward. It also appears that she did not grasp for any support until she had taken the step forward and was falling. Whether the presence of a rail or other support would then have availed her is a matter for conjecture only.

No other witness aside from the plaintiff testified as to what actually occurred at the time of her alleged

fall down the steps in question or while she was in the 2 inner rooms. Several witnesses testified for the plaintiff as to what transpired before and subsequent to the occurrence and as to her physical condition, alleged injuries and disabilities, including the medical testimony in relation thereto.

For the defendant, Ida Broyles, aged 58, testified that she had been the matron in the 2 rooms since 1925 and was on duty from 3 to 11 o'clock of each day, including the afternoon of the alleged occurrence, but knew of no one falling and had heard of no one falling or being injured; that the steps were used by her and by many women every day and that she never knew or heard of anyone falling on those steps since they were built. In rebuttal thereto, the plaintiff and her nephew, who did not go into the rooms, testified that they saw no matron there on that day. On behalf of the defendant, witness Carter testified in substance that he was the division engineer of the Chicago Terminal Division of the defendant company, among whose duties were the maintenance and repair of the particular station and that he had been acquainted with the steps in question for 10 or 12 years; that they had been renewed or rebuilt in 1937; that the steps in question were constructed in the usual and ordinary manner for constructing steps of that character; that the carpentry thereof was of good practice, as well as the tread and construction of the steps and risers; that it was not the usual custom and practice to put railings on steps of that kind, type or size. We hold from detailed recitals of his knowledge and experience that sufficient foundation was laid as to witness' knowledge of usual customs and practices to justify the court in the exercise of its sound discretion in permitting the witness to answer such questions. The probative value of the answers were matters for the jury. Concerning the light, witness Carter testified to periodical readings and measurements of the amount of light and size of

globes and bulbs used in the rooms; to the average number of people, shown by counts made at intervals, to have daily frequented the station and its use by people of all ages and stages of health, and that no previous accidents had occurred, to his knowledge. George M. Freeborn, employed in the engineer's department of the defendant company prepared the scale map of the steps and surroundings which was exhibited in evidence. He testified as to the locations and conditions, height of the lights, globes, windows and concerning the steps in question. John C. Walsh, custodian of the station, also gave testimony in relation thereto and of regular daily inspections by him of the condition of the women's rest rooms; that prior to the accident, an average of at least 500 people used these steps each day; that he had never known or heard of any other person falling thereon or of any report thereof, and first heard of plaintiff's claim about 2 weeks before the trial. George Hankey, carpenter foreman of defendant company for 15 years was in charge of the men who built the steps in 1937 under engineer Carter's direction; he testified that the treads were built of oak and had replaced old steps of the same size and dimensions, which were in the usual and customary manner of building similar steps; that it was not usual or customary to place handrails on steps of that size and dimension unless there was an opening on either side into which a person might fall. Kenneth Carney, claim agent of the defendant company, testified that he first learned of the alleged injuries through a letter from plaintiff's attorney in February 1941; that no report of any alleged accident or injury incurred on these steps had been made since he became claim agent in 1926.

Upon the motion for a directed verdict in favor of the defendant and for a judgment notwithstanding the verdict, we can only consider the question of whether or not there is any evidence in the record which, with

legitimate and reasonable inferences therefrom, when viewed in the light most favorable to the plaintiff, tends to prove the material allegations of plaintiff's cause of action under any of the allegations of negligence. From the evidence, we are constrained to hold that a controverted question of fact arose as to whether or not the defendant had provided adequate and proper lights and lighting fixtures, sufficiently illuminating the steps for the safety of persons using the same. While we believe from the evidence and the jury found by its special verdict, that the defendant had not failed to provide proper illumination for the stairs, we also hold that there was some evidence, which when viewed in the light most favorable to the plaintiff, with all reasonable inferences arising therefrom, tended to sustain plaintiff's allegation concerning insufficient illumination of the stairs and the further allegation that such alleged failure tended to proximately cause plaintiff's alleged fall and injury. With the above testimony in the record, we hold that the trial court properly denied defendant's motion for a directed verdict of not guilty under subparagraph (e) charging such specific negligence and under subparagraph (f) of paragraph 5 charging general negligence.

Whether or not the testimony of the plaintiff that in view of the light conditions as detailed by her, combined with the absence of a handrail, and her evidence that she stepped out from the upper floor level and missed the step before grasping for a possible handrail which did not exist, constituted a prima facie showing of due care on her part, under the more or less confused, uncertain and contradictory statements and circumstances detailed by her, is a close question. Standing alone, we do not believe that plaintiff showed that the absence of the rail or of her first having fallen and then grasping for a rail, unaffected by the alleged light conditions, would constitute a prima facie show-

ing of due care; yet, under a motion for judgment notwithstanding the verdict and a charge of general negligence, the court must view all of the evidence in the light most favorable to the plaintiff, and we therefore hold that the trial court properly denied a motion for judgment notwithstanding the verdict. The same rule of law prevails in passing upon motions for a judgment notwithstanding the verdict as applies to motions for directed verdicts interposed at the close of the evidence.

Upon the motions of both parties to set aside the verdict and grant a new trial, we are confronted with a different rule of law. Under the motion for a new trial, if the court finds that the verdict of the jury is contrary to the manifest weight of the evidence, it becomes the duty of the court to reverse and remand the cause for a new trial. In passing upon this motion, we find from the evidence that a general verdict of guilty based on a charge of insufficient illumination would be contrary to the manifest weight of the evidence and on this charge of negligence, the special finding of the jury also held against the plaintiff. The same is equally true of the charge that the defendant negligently failed to furnish a ramp or other safety device instead of the steps in question upon which a special verdict contrary to plaintiff's contention was likewise returned. On the above issues, the jury, by its special verdict, limits and controls any inconsistent general verdict based on such charges of negligence. Our statute expressly provides and this court has held that upon an issue of negligence so submitted to the jury, the special verdict controls an inconsistent general verdict. Section 65, Civil Practice Act (sec. 189, ch. 110, Ill. Rev. Stat. 1941 [Jones Ill. Stats. Ann. 104.065]); *Goodman v. Chicago, B. & Q. R. Co.*, 289 Ill. App. 320, 7 N. E. (2d) 393. Two specific charges of negligence were withdrawn and dismissed by the plaintiff at the close of the testimony, in which it had

been charged in substance that the floors of the 2 rooms should have been constructed on a continuous and not on different levels and that the steps failed to have cleats and were slippery and dangerous in construction. No testimony tending to support those allegations of negligence appears in the record and they were properly withdrawn by the plaintiff. No general verdict based upon either of such allegations of negligence which were so withdrawn and which were not supported by the evidence could stand. The only other allegation upon which any evidence was heard by the jury, or which could be considered by the jury as a basis for their general verdict, would be the special allegation of negligence in failing to provide handrails or supports which proximately caused the plaintiff's fall and resultant damages and we hold that a general verdict based thereon, even though the alleged lack of sufficient illumination against which the special verdict was found, were considered in connection therewith, would, if found in favor of the plaintiff, be contrary to the manifest weight of the evidence. The affirmative finding of a special verdict of negligence is not binding upon the trial court upon defendant's motion to set it aside, if it is not supported by any evidence, or if, as here, it is contrary to the manifest weight of the evidence. *Paul v. Garman,* 310 Ill. App. 447, 34 N. E. (2d) 884, and citations therein. No other charge of general or specific negligence appears in the testimony. We therefore find and hold that the general verdict of the jury in favor of the plaintiff and against the defendant is contrary to the manifest weight of the evidence and that the assigned error based upon the denial of defendant's motion for a new trial was well founded.

It is further assigned as reversible error by the defendant that the refusal of a tendered instruction holding that if the jury finds from the evidence that the plaintiff's fall was accidental and occurred without

any negligence on the part of the defendant, as the same is defined in the instructions, the jury should find the defendant not guilty. Respective parties have cited cases under varying circumstances wherein our courts of review have held the giving or refusal of this instruction to be proper or to be reversible error or harmless error, under different state of facts appearing in each case. Without analyzing the surrounding facts and circumstances of the cases so cited, we are constrained to hold that in view of the serious question as to whether or not any negligence by defendant was shown herein, the jury might well have found that no proof of negligence existed and that the injury alleged, if any, was solely due to accident. We hold that it was error for the court to refuse to give that instruction herein.

Defendant also contends as a ground for reversal that the amount of the verdict is excessive. Without setting forth the evidence of the nature and extent of plaintiff's alleged injuries or analyzing the same at this time, we hold from the record that the amount of the verdict, if plaintiff is entitled to any verdict, was not excessive.

Plaintiff, in her motion for a new trial and assignment of cross-errors complains that the amount of the verdict was inadequate under proof of the nature and extent of plaintiff's injuries, both temporary and permanent, and of other elements of damage upon which evidence was heard. While we deem the amount of the allowance to have been moderate, the probative value of the testimony of the respective parties in relation thereto and the amount of damages sustained, where the right of action and recovery is properly shown, is a matter to be determined by the jury, under the law and the evidence. Objection to defendant's given instruction "O" requiring the verdict to be based upon the law and the evidence is without merit. A similar instruction was given and was approved

by the Supreme Court in the case of *People v. Cassin,* 322 Ill. 276, 153 N. E. 381.

For the reasons hereinabove set forth, we find that reversible error appears in the record and the cause is therefore reversed and remanded to the circuit court of McLean county for retrial.

*Reversed and remanded.*