RICHARDS, Admr., Appellant,

v.

BROADVIEW HEIGHTS HARBORSIDE HEALTHCARE, Appellee.

[Cite as *Richards v. Broadview Hts. Harborside Healthcare,*
150 Ohio App.3d 537, 2002-Ohio-6491.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 80612.

Decided Nov. 27, 2002.

538

Dworken & Bernstein Co., L.P.A., Alec Berezin and Kristen M. Sherlock, for appellant.

Reminger & Reminger Co., L.P.A., and Thomas A. Prislipsky, for appellee.

MICHAEL J. CORRIGAN, Judge.

I

{¶ 1} Plaintiff-appellant Susan Richards ("Richards") brings this appeal from the trial court's grant of summary judgment in favor of defendant-appellee Broadview Heights Harborside Healthcare ("Harborside"). Richards had brought suit against Harborside individually and as administrator of the estate of her father Albert Stahl alleging negligence, violations of Ohio and federal Nursing Home Resident's Bill of Rights, pain and suffering, and wrongful death,

seeking compensatory and punitive damages. The trial court granted Harborside's motion for summary judgment, relying on this court's decision in *Sabol v. Richmond Hts. Gen. Hosp.* (1996), 111 Ohio App.3d 598, 676 N.E.2d 958.

## II

{¶ 2} The relevant, undisputed facts are as follows. On October 23, 2000, Albert Stahl was transferred from Marymount Hospital to Harborside. As described in the complaint, and as admitted by defendant-appellee in its answer, Harborside is "a short term and extended care skilled rehabilitation and nursing center." Stahl was placed on the second floor, which was described by Harborside's counsel during deposition as either the "memory impaired" or the "impaired cognition" unit. (Roberts Dep. at 11.) At this time, Stahl was diagnosed with, among other things, dementia and was assessed to be at risk for elopement and falls.

{¶ 3} Stahl attempted to leave the facility on two occasions. Once, while in an elevator, he told a staff member that he was going downstairs to get his tools. He was successfully "redirected." On another occasion, he told a staff member that he was leaving and that they could not stop him. Harborside attached a personal alarm, described as the least restrictive personal alarm, to Stahl's wheelchair and clothing. The alarm was triggered when the patient got up from the wheelchair. Stahl routinely disconnected the alarm and wandered around the nursing home.

{¶ 4} Stahl's family visited him on November 6, after which some of them told staff members that Stahl was not wearing his personal alarm. The staff never replaced his alarm. Also during this visit, he told his family that he was going to leave "one leg at a time." His wife testified that he made this statement in response to their daughter Elaine's question of how he was going to get out to clean the flues. His daughter Carol testified that she does not recall any mention of the flues, but, rather, that Stahl simply said he was going to leave. In any case, they did not report this statement to the staff because they did not believe that he was serious. Also on that day, Stahl was given a psychiatric evaluation.

{¶ 5} That evening, after dinner, Stahl was missing and a search was begun. He was eventually found lying in a fetal position in the courtyard around 7:30. It was determined later that he had climbed out of a window on the second floor onto a roof and either fell or jumped off.

{¶ 6} Geraldine Roberts, a nurse at Harborside, examined Stahl after he was carried to his bed, sometime around 7:30 that evening. She noticed nothing abnormal. She testified that his knee looked a little swollen, but that it always

did.  Further, she testified that Stahl let staff members move his legs all around and that he "never blinked an eye."  (Roberts Dep. at 53.)

{¶ 7}  During rounds that night, nurse Rena O'Hara noticed that his legs were "not anatomically correct" and that they were in a frog-like position.  She then called Dr. Sundaram to get approval to send Stahl to the hospital.  She then called for an ambulance, which took Stahl to Marymount Hospital.  A couple of hours later, Stahl was transferred to Metro General Hospital for a more thorough exam.  There is some dispute about when staff members called Stahl's family to tell them about the fall and about the transfer to the hospital.

### III

{¶ 8}  Richards brings one assignment of error:

{¶ 9}  "Assignment of Error:  The trial court erred in granting defendant-appellee's motion for summary judgment."

### A

{¶ 10}  Under this one assignment, Richards raises three issues for this court's determination:  (1) "The trial court erred in relying on *Sabol v. Richmond Heights General Hospital* (1996), 111 Ohio App.3d 598, 676 N.E.2d 985 [sic, 958], as *Sabol* is distinguishable from the case at bar";  (2) "Summary Judgment i[s] not appropriate in an action for medical negligence where genuine issues of material fact exist and must be resolved by a jury";  and (3) "Summary Judgment is not appropriate on Plaintiff's claim for punitive damages with respect to Harborside's violation of Albert Stahl's Nursing Home Resident's Bill of Rights."

{¶ 11}  We will discuss the first two issues together and then discuss the third issue separately.

### B.  Issues Number One and Two

#### 1.  Standard of Review

{¶ 12}  Appellate review of summary judgment is de novo.  The Ohio Supreme Court recently set out the proper test when considering a motion for summary judgment:

{¶ 13}  "Pursuant to Civ.R. 56, summary judgment is appropriate when (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, said party being entitled to have the evidence construed most strongly in his favor. *Horton v. Harwick Chem. Corp.* (1995), 73 Ohio St.3d 679, 653 N.E.2d 1196, paragraph

three of the syllabus. The party moving for summary judgment bears the burden. of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 292–293, 662 N.E.2d 264, 273–274." *Zivich v. Mentor Soccer Club* (1998), 82 Ohio St.3d 367, 369–370, 696 N.E.2d 201.

2

{¶ 14}  Experts produced by Richards and Harborside, who focused their testimony on the foreseeability of Stahl's actions, differed as to whether Harborside's care fell below the requisite standard. One thing not established by their testimony, however, was the requisite standard of care *for the nursing staff at Harborside*. In medical negligence cases, " 'evidence as to the recognized standard of the medical community in the particular kind of case' " must be presented. *Bruni v. Tatsumi* (1976), 46 Ohio St.2d 127, 131, 75 O.O.2d 184, 346 N.E.2d 673, quoting *Davis v. Virginian Ry. Co.* (1960), 361 U.S. 354, 357, 80 S.Ct. 387, 4 L.Ed.2d 366.

{¶ 15}  Generally speaking, and as a matter of law, the requisite standard of care of the staff at Harborside is that which places a duty on the nursing staff to "employ that degree of care and skill that a nurse of ordinary care, skill and diligence would employ in similar circumstances." *Sabol* at 601, 676 N.E.2d 958, citing *Berdyck v. Shinde* (1993), 66 Ohio St.3d 573, 613 N.E.2d 1014, paragraph three of the syllabus. Yet to be determined, however, are those "circumstances." In other words, because there is a dispute whether Harborside is a general or a specialized care facility, the standard of care applicable to its staff cannot be established.

{¶ 16}  Neither side offers any definition of Harborside nor any definition of a skilled care facility. Both simply offer conclusory statements that Harborside either is or is not a skilled care facility. This issue needs to be determined before a standard of care can be established. The record does not provide an answer as to what kind of facility Harborside is. The complaint describes Harborside as "a short term and extended care skilled rehabilitation and nursing center." Harborside admits to this description in its answer.[1] Further, Harborside's counsel described the second floor of Harborside, where Stahl was placed, as either the "memory impaired" or the "impaired cognition" unit. Also, the nurses who were deposed testified that they had worked only in specialized health care facilities, but it is unclear from the testimony whether a

---

1.  "An admission made in the pleadings is equivalent to proof of the fact admitted; it dispenses with the need for further proof." *Rhoden v. Akron* (1988), 61 Ohio App.3d 725, 728, 573 N.E.2d 1131, citing *Duffy v. Cleveland Coin Machine Exchange, Inc.* (App.1956), 77 Ohio Law Abs. 27, 138 N.E.2d 307. See, also, Civ.R. 8.

nursing home in general or Harborside in particular is a specialized health care facility.[2] Further, Stahl was transferred from Marymount, a general hospital, to Harborside. One could reasonably infer that such transfer was made because of Stahl's mental problems.

{¶ 17} Conversely, Richards's own expert opines in her deposition that Stahl should have been transferred out of Harborside into a "more truly dementia unit." Richard's expert, Mary Taylor, in her report, stated that Stahl was not provided with the customary care of "a resident in a certified nursing facility." (Taylor Expert Report at 2.) In the very next paragraph, though, Taylor opines that the care provided to Stahl fell below "any standard of care within the long term care industry." Id. While Taylor's legal principles are not necessarily in error (the standard of care does depend on the kind of health care facility), her standard is ultimately imprecise since nowhere is it established what type of facility Harborside is.

3

{¶ 18} Both sides concede that whether Harborside is a specialized care facility is the crucial issue on appeal because, if Harborside is a general care facility, then *Sabol* applies and the trial court's grant of summary judgment in favor of Harborside should be affirmed.

{¶ 19} In *Sabol*, the plaintiff, after attempting suicide, was admitted to a general care hospital while awaiting transfer to a more specialized care facility. After an initial attempt to run away, the plaintiff was directed to a bed, after which the nurses discussed placing physical restraints on him. They ultimately decided not to use the physical restraints because they believed that they would only make the plaintiff more aggressive. About five hours later, the plaintiff got out of bed, knocked over the attending nurse, eluded other nurses, and jumped out of the window, suffering minor injuries. Plaintiff then sued the hospital, alleging that the nurses had breached their duty of care. The trial court granted summary judgment in favor of the hospital, agreeing with the hospital that the nurses "had no duty to take further precautionary measures." *Sabol*, 111 Ohio App.3d at 600, 676 N.E.2d 958.

{¶ 20} In affirming the trial court's ruling, this court held in *Sabol* that because "nurses are persons of knowledge and skill and must employ that degree of care and skill that a nurse of ordinary care, skill and diligence would employ in similar circumstances," nurses at a general care facility could not be held to a

---

**2.** Of course, the standard of care would depend on whether the nurses are specially licensed: "[T]he statutory standards for licensure are relevant to the standard of conduct required of licensed nurses in Ohio, and may be used to prove that standard." *Berdyck*, 66 Ohio St.3d at 582, 613 N.E.2d 1014.

standard of care applicable to nurses at a specialized care facility. Id., 111 Ohio App.3d at 601, 676 N.E.2d 958.[3]

### 4

{¶ 21}   Finally, whatever Harborside may be, it is clearly not a general hospital. The record suggests, but hardly requires, that Harborside be considered as some kind of specialized care facility. The opposite may well be true and the requisite standard of care may turn out to be lower than that of a general hospital. In either event, the standard of care applicable to Harborside, a matter of law, cannot be determined without a determination of the type of facility Harborside is, a matter of fact.

{¶ 22}   When it is determined what type of health care facility Harborside is, the standard of care applicable to Harborside will be that of similar health care facilities. This standard, of course, must be established by expert testimony. *Bruni v. Tatsumi* (1976), 46 Ohio St.2d 127, 75 O.O.2d 184, 346 N.E.2d 673. See, also, *Dimora v. Cleveland Clinic Found.* (1996), 114 Ohio App.3d 711, 718, 683 N.E.2d 1175.

### C.   Issue Number Three

{¶ 23}   We now turn to whether the trial court properly granted summary judgment in favor of Harborside on Richards's claim for punitive damages with respect to Harborside's alleged violation of the Nursing Home Resident's Bill of Rights statute, R.C. 3721.10 et seq.

### 1

{¶ 24}   Richards alleged in Count Two of her complaint that Harborside violated Ohio and federal law by violating the Nursing Home Residents Bill of Rights (R.C. 3721.10 through 3721.18 and Sections 483.12 and 483.13, Title 42, C.F.R.) in the following ways:

{¶ 25}   "a.)   Harborside failed to provide adequate medical care;

{¶ 26}   "b.)   Harborside neglected decedent;

{¶ 27}   "c.)   Harborside failed to timely notify decedent's family of changes in his health status;

{¶ 28}   "d.)   Harborside failed to timely notify decedent's family of an accident which resulted in injury;

---

**3.** We acknowledge that *Sabol* dealt with a general hospital and not a nursing home. However, the crux of that case, as here, is the standard of care expected of nurses "in similar circumstances." *Sabol,* 111 Ohio App.3d at 601, 676 N.E.2d 958.

{¶ 29} "e.)   Harborside failed to provide a safe living environment;

{¶ 30} "f.)   Harborside failed to care for decedent in a manner and in an environment that promoted maintenance or enhancement of his quality of life;

{¶ 31} "g.)   Harborside failed to timely notify decedent's family of the decision to transfer decedent to a hospital;

{¶ 32} "h.)   Harborside failed to properly report and investigate suspected incidences of abuse and/or neglect;

{¶ 33} "i.)   Harborside failed to ensure that decedent's environment remain as free of accidental hazards as was possible;

{¶ 34} "j.)   Harborside failed to ensure that decedent received adequate supervision and assistance devices to prevent accidents." (Complaint, Count Two.)

{¶ 35}   Harborside argues that a cause of action under R.C. 3721.17 does not survive the "resident" and that summary judgment was therefore proper.   Harborside further argues that Richards's reliance on R.C. 3721.17(I)(1) ("Any resident whose rights under 3721.10 to 3721.17 of the Revised Code are violated has a cause of action against any person or home committing the violation.   The action may be commenced by the resident or by the resident's sponsor on behalf of the resident.") is misplaced because that provision merely allows another, as a sponsor of the resident, to bring the action;   it does not, argues Harborside, allow the cause of action to survive the death of the resident.

{¶ 36}   Therefore, if the cause of action provided for in R.C. 3721.17(I)(1) survives the resident's death, then Richards may bring her claim as sponsor of Stahl.   If the cause of action expires with the resident, then Richards has no cause of action to bring, regardless if she would otherwise have standing as Stahl's sponsor.

2

{¶ 37}   R.C. 3721.17(I)(1) provides: "Any resident whose rights under sections 3721.10 to 3721.17 of the Revised Code are violated has a cause of action against any person or home committing the violation.   The action may be commenced by the resident or by the resident's *sponsor* on behalf of the resident." (Emphasis added.)   Further, a "sponsor" is "an adult relative, friend, or guardian of a resident who has an interest or responsibility in the resident's welfare."   R.C. 3721.10(D).   Finally, "[a] sponsor may act on a resident's behalf to assure that the home does not deny the resident's rights under sections 3721.10 to 3721.17 of the Revised Code." R.C. 3721.13(B).

{¶ 38} Ohio's survivor statute provides: "In addition to the causes of action which survive at common law, causes of action for mesne profits, or injuries to the person or property, or for deceit or fraud, also shall survive; and such actions may be brought notwithstanding the death of the person entitled or liable thereto." R.C. 2305.21.

{¶ 39} Residents' rights did not exist at common law. Therefore, a cause of action under the residents' rights statutes will survive the death of a resident if the cause of action is one for mesne profits, injuries to person or property, or deceit or fraud.

{¶ 40} "The survival statute provides that any cause of action which a person would have for personal injury during his lifetime survives his death and may be brought on behalf of his estate." *Jones v. Wittenberg Univ.* (C.A.6, 1976), 534 F.2d 1203, 1207. Therefore, any causes of action under the residents' rights statutes for mesne profits, for injuries to person or property, or for deceit or fraud—and for those actions only—survive the resident's death. Any causes of action under the residents' rights statutes for things other than those specified in the survival statute do not survive the resident's death.

{¶ 41} Therefore we conclude that the rights in the residents' rights Act did not exist at common law and that only those violations in the residents' rights Acts that create causes of action for mesne profits, injuries to person or property, or deceit or fraud survive Stahl's death.

3

{¶ 42} Applying that standard to the facts of this case, we determine that of the allegations made against Harborside by Richards under the Residents' Rights Act, the following survive Stahl's death: Harborside's alleged failure to provide adequate medical care; Harborside's alleged neglect of Stahl; Harborside's alleged failure to provide a safe living environment; Harborside's alleged failure to care for decedent in a manner and in an environment that promoted maintenance or enhancement of his quality of life; Harborside's alleged failure to ensure that decedent's environment remain as free of accidental hazards as was possible; and Harborside's alleged failure to ensure that decedent received adequate supervision and assistance devices to prevent accidents.

{¶ 43} Because Stahl could have brought the above causes of action for personal injury during his lifetime, those causes of action may be brought on behalf of his estate. *Jones,* supra.

## IV

{¶ 44} This matter is therefore reversed and remanded to the trial court for further proceedings consistent with this opinion.

Judgment reversed
and cause remanded.

DIANE KARPINSKI, J., concurs separately.

TIMOTHY E. McMONAGLE, A.J., concurs in judgment only.

KARPINSKI, Judge, concurring.

{¶ 45} I concur with the majority, but write separately to clarify the application of *Sabol v. Richmond Hts. Gen. Hosp.* (1996), 111 Ohio App.3d 598, 676 N.E.2d 958, to the case at bar.

{¶ 46} The facility in the case at bar is quite different from the facility in *Sabol.* In *Sabol,* the facility was an acute, short-term, general *hospital,* which the court determined did not routinely deal with suicidal patients. In the case at bar, the facility was a long-term, extended-care facility. Moreover, it was the policy of Harborside to evaluate newly admitted persons with elopement problems and to develop a plan to address such problems. Such a policy implies the facility's awareness of the special needs of patients with elopement problems.

{¶ 47} The two facilities also differ on their admission practices. In *Sabol,* a patient had to be accepted for emergency treatment under the federal Emergency Medical Treatment and Labor Act, Section 1395dd, Title 42, U.S.Code ("EMTALA"). Under EMTALA, hospitals that accept payment from Medicare and operate an emergency department must (1) give the patient an appropriate medical screening and determine whether the patient has an emergency medical condition and (2) stabilize the patient prior to transfer, if transfer is necessary. In *Sabol,* the patient had an emergency medical condition and the facility thus had a common-law and statutory duty to provide emergency care that included admitting him and stabilizing him before he could be transferred to a specialized treatment facility, for which transfer the preparations were in process.

{¶ 48} In the case at bar, however, the facility had no duty to admit decedent for emergency care. In fact, it was not under any duty to admit him. Once it did admit the decedent, however, the facility had a duty to employ at least the degree of care and skill that a nursing home staff of ordinary care, skill, and diligence would employ in similar circumstances. Evidence that he was left unattended in a second-story lunchroom, when the facility had specific knowledge that he was a high risk for elopement, along with evidence that he generally wore

a personal alarm and that the nurse was notified that he was not wearing his alarm that day, are facts that raise genuine issues of negligence.[4]

{¶ 49}   It is not sufficient to ask only whether Harborside was *certified* for the specialized care the decedent needed or whether the nurses were *specially licensed* for this care.   There is also the question of whether Harborside *held itself out* as qualified to care for the stage of decedent's dementia.   Moreover, as the majority notes, an employee admitted that "Harborside was a facility that specialized in the care of patients suffering from dementia."

{¶ 50}   Harborside "has a duty to exercise reasonable care for the safety of its patients; the reasonableness of such care* * *is an issue of fact which must be determined by the trier of fact."   *Gray v. Jefferson Geriatric & Rehab. Ctr.* (1991), 76 Ohio App.3d 499, 501, 602 N.E.2d 396. Thus there is the broader question of whether a reasonably prudent person would believe it was foreseeable that decedent, if not closely monitored, would suffer injury.   As an expert, Mary Taylor testified that the care exercised by the facility's staff "fell below the degree of care and skill that a nursing home staff of *ordinary* [emphasis added] care, skill, and diligence would employ in similar circumstances."   Upon remand, the plaintiff may present this argument.

{¶ 51}   The either-or framework of the issue employed by *Sabol* is confusing when applied to a mixed-care facility.   That some or even most of the units are not specialized units for the care of "memory impaired" or of those with "impaired cognition" does not prevent the facility itself from being classified as a specialized-care facility as least in regard to any units it maintains for such specialized care.   As the majority writes, "Harborside's counsel described the second floor of Harborside, where Stahl was placed, as either the 'memory impaired' or the 'impaired cognition' unit."   Thus the standard of care may be different for patients in such units.   Thus as the majority notes (fn. 3), the crucial issue is the standard of care expected of nurses "in similar circumstances."

{¶ 52}   The circumstances are not limited to licensing or certification or even to the type of facility.

---

4.  There was also evidence that when decedent did not have an alarm in the past, his wheelchair was placed in front of the nurses' station.   This practice provides an alternative to the alarm and also indicates an awareness that decedent needed supervision.