REGINA MORTON, Plaintiff-Appellant, v. THE CITY OF CHICAGO, Defendant-Appellee.

First District (3rd Division)   No. 1—95—1192

Opinion filed January 22, 1997.

Edward R. Vrdolyak, Ltd., of Chicago (Timothy Quinn, of counsel), for appellant.

Susan S. Sher, Corporation Counsel, of Chicago (Lawrence Rosenthal, Benna Ruth Solomon, and Thomas J. Bamonte, Assistant Corporation Counsel, of counsel), for appellee.

JUSTICE LEAVITT delivered the opinion of the court:

On February 28, 1990, the plaintiff, Regina Morton, was rendered paraplegic when a car driven by Jamal Massie careened into her as she was sitting at a bus stop near 59th and State Streets in Chicago. At the time, Massie was attempting to elude police and had been travelling southbound on State Street at speeds estimated at up to 60 miles per hour. He crossed into the northbound lanes, ignored a red light at 59th Street and hit a taxicab. His vehicle deflected off the cab and into the plaintiff, severing her spinal cord. She sued Massie, as well as the City of Chicago (the City), alleging that the police had been negligent and wilful and wanton while in pursuit of Massie.

The plaintiff settled with Massie's auto insurer. Pursuant to the immunity provided by section 2—202 of the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/2—202 (West 1994)), the trial judge granted summary judgment in favor of the City on the negligence count. The wilful and wanton count was tried, and a jury returned a general verdict in favor of the plaintiff, awarding $2 million in damages. The jury apportioned 20% of the liability to the City and 80% to Massie. In response to a special interrogatory, however, the jury responded "no" to the question of whether either or both of the police officers driving the squad car in pursuit of Massie had acted in a wilful and wanton manner. Given the inconsistency between the general verdict and the answer to the special interrogatory, the trial judge entered judgment notwithstanding the verdict in favor of the City. See 735 ILCS 5/2—1108 (West 1994). We affirm.

On the day the plaintiff suffered her injuries, Chicago police officer Vance Bonner and Detective Louis Ford were working together as part of the police department's District 2 "plainclothes" tactical unit. District 2 is a high crime area located between 35th and 60th Streets. Ford and Bonner drove an unmarked vehicle equipped with a radio, as well as a high intensity spotlight, "oscillating" headlights and a siren. The latter two devices are operated by a switch located underneath the car's dashboard.

According to both Ford and Bonner, on February 28, they received information that occupants of a red car had been involved in a gang feud that had erupted in District 2. The feud included drive-by shootings, and the officers were informed that the occupants of the red car would be in possession of guns and possibly narcotics. At about 6:40 p.m., Ford was driving, and the two officers were on 53rd Street between Wabash and State Streets when they observed a red Nissan stopped in the middle of the street. This area of District 2 "was noted for extremely heavy narcotics trafficking and gang activity."

Detective Ford stopped his car behind the Nissan and activated his oscillating headlights in order to alert the car's occupants that Ford and Bonner were police. Ford also turned on the spotlight to illuminate the inside of the Nissan. Several people were also milling about outside the Nissan. Ford and Bonner got out of their car and announced that they were police officers. Each officer removed his gun from its holster. Officer Bonner was behind Ford. As the two approached, Ford observed an occupant in the front passenger seat point "a small caliber handgun" at him. Ford yelled to Bonner that the man had a gun and then prepared to defend himself by aiming his weapon at the occupants of the car. As he did so, Massie, the driver of the car, drove away, heading east on 53rd Street, accelerating to a high rate of speed.

Ford and Bonner returned to their car and began driving east on 53rd Street. Their oscillating headlights remained "on." Ford did not activate the car's siren at that time or at any time prior to the plaintiff's injury. He decided not to do so for several reasons. He believed it was unsafe to do so because traffic was heavy at the time, and he did not want to unduly alarm other drivers who might, for instance "slam on their brakes [or] move over without looking [in order] to surrender the right-of-way to the officer." Ford also stated that sounding his siren would have been futile "because the fleeing assailant was so far away that the probability of me apprehending him was somewhat null at that point." He did not perceive that he presented any danger to anyone because the Nissan was so far ahead of him that the siren would have been ineffective in warning others about the speeding Nissan. Finally, Ford believed that it would be unsafe for him to activate the siren because he would be unable to hear the sirens of other police cars.

When he arrived at the corner of 53rd and Wabash, Ford saw the Nissan turn onto 54th Street, heading west. Ford testified that he did not consider himself in "pursuit" of the Nissan, although in reports he filled out following the arrest of the Nissan's occupants, Ford

indicated that he had been in pursuit of the car. In any event, as they continued, Bonner, using the car radio, apprised other officers in the area of the situation.

Ford stated that he was driving between 30 and 35 miles per hour. As Ford and Bonner proceeded south on Wabash, the Nissan was about a block ahead of them, but they eventually lost sight of it. Ford turned onto 54th Street and drove west, still unable to see the Nissan. They reached the intersection of 54th and State Streets, and Ford saw the Nissan heading south on State Street, approaching the intersection of 55th Street and Garfield Boulevard. Ford waited for traffic to clear and turned southbound on State Street. The Nissan passed through a red light at 55th Street. Bonner continued relaying the position of the Nissan to other officers by radio.

The Nissan gradually increased its distance from Ford and Bonner to two blocks. As the officers passed Garfield Boulevard, Ford saw the Nissan speed through a red light at 57th Street. Ford stopped for the red traffic signal at 55th Street and proceeded when the light turned green. Ford watched as the Nissan crossed from the southbound lanes of State Street into the northbound lanes. At 57th Street, he stopped for another red light. Although he was uncertain if it was before he stopped or after he passed through the subsequent green light at 57th Street, Ford watched the Nissan speed through another red light at 59th Street and strike a cab in the intersection. Also, at 57th Street, Ford saw another unmarked police vehicle, which he believed belonged to Officers Hampton and Russell. Hampton's testimony confirmed Ford's as to the movement of the Nissan between 57th and 59th Streets. Hampton watched the Nissan hit another car as Ford's vehicle passed him at 57th Street.

Ford proceeded to 59th Street and observed that the Nissan had come to rest underneath the elevated tracks on the east side of State Street. Other police officers also arrived, and Ford informed them that the occupants of the Nissan were armed with guns. The officers approached the car with guns drawn. Massie had fled, but other passengers were still inside, injured. They were arrested. The plaintiff was discovered, injured, on the sidewalk.

The plaintiff's action against the City was premised largely upon Ford's failure to activate his siren. She offered into evidence section VI of Chicago Police Department General Order 81—8, which governs the manner in which police officers are to engage in emergency vehicular pursuits of suspects. The policy underlying section VI is as follows:

> "[T]hat a motor vehicle pursuit is justified only when the necessity of immediate apprehension outweighs the level of inherent

danger created by the pursuit. Officers and their supervisors will evaluate the nature of the pursuit in light of its dangers and make a judgment whenever necessary to terminate the pursuit. AN OFFICER INVOLVED IN A MOTOR VEHICLE PURSUIT MUST BE PREPARED TO JUSTIFY HIS ACTIONS." General Order 81—8, § VI(A).

Section VI(D)(1)(c) provides that "[p]olice officers operating unmarked Department vehicles may only engage in a motor vehicle pursuit in the event of an extreme emergency (e.g., when the fleeing motor vehicle represents an immediate and direct threat to life or property)." General Order 81—8, § VI(D)(1)(c). Most important, as regards this action, the operator of an unmarked police vehicle "will only initiate a motor vehicle pursuit when *** he *** has activated the high-beam oscillating head lights and siren." General Order 81—8, § VI(D)(2)(a)(2).

The plaintiff contended that Ford's and Bonner's failure to activate their siren was wilful and wanton conduct which caused her injury. The plaintiff theorized that had either she or the driver whose cab was struck by Massie heard a siren, they would have been made aware of and been able to avoid being struck. Although the jury issued the general verdict in her favor, the trial judge entered judgment for the defendant due to the jury's answer to the special interrogatory.

The plaintiff contends that the answer to the special interrogatory was not inconsistent with the general verdict. Special interrogatories "act as a check upon the deliberations of the jury as to an ultimate question of fact." *LaPook v. City of Chicago*, 211 Ill. App. 3d 856, 865, 570 N.E.2d 708 (1991). If the jury's answer to a special interrogatory is inconsistent with a general verdict, the special interrogatory controls the outcome of the case. 735 ILCS 5/2—1108 (West 1994). However, if the special interrogatory "does not cover all of the issues submitted to the jury and a reasonable hypothesis exists to permit the general verdict to be construed consistently with the special interrogatory, they cannot be said to be irreconcilable and the special finding will not control." *LaPook*, 211 Ill. App. 3d at 865.

The special interrogatory asked, "Was the conduct of Detective Louis Ford or Officer Vance Bonner or both wilful and wanton?" The plaintiff asserts three bases from which she concludes that the general verdict was consistent with the negative answer to the interrogatory.

■ First, the plaintiff argues that because the special interrogatory is in "doubly-disjunctive form, positing three separate, and essentially mutually exclusive, alternative questions," a negative

answer to the question is consistent with a general verdict in the plaintiff's favor. According to the plaintiff, the jury may have answered "no" to the question because it found Officer Bonner's conduct as the passenger in Detective Ford's car to be not wilful and wanton, but issued the general verdict in the plaintiff's favor because it found Ford's conduct in failing to use the siren to be wilful and wanton.

The defendant points out that the plaintiff failed to raise a specific objection as to the disjunctive form of the interrogatory and has, therefore, waived the issue. The plaintiff responds that her general objections to the giving of the interrogatory suffice to preserve all issues as to its form. Generally, a party's failure to raise a specific objection to the form of an interrogatory waives that ground when raised on appeal. *LaPook*, 211 Ill. App. 3d at 864. We have reviewed the record, and the plaintiff did not object to the disjunctive form of the interrogatory. Therefore, it is waived.

However, as the court in *LaPook* pointed out, although the plaintiff may have waived a question as to the form of the interrogatory, she is still only bound by the interrogatory to the extent it is inconsistent with the general verdict. *LaPook*, 211 Ill. App. 3d at 864-65. Thus, we still address the plaintiff's contention because its primary thrust is that the general verdict was not inconsistent with the negative answer to the special interrogatory.

■ The plaintiff does not explain how the disjunctive form of the interrogatory renders the answer consistent with the general verdict, beyond citing the decision in *Kirshenbaum v. City of Chicago*, 43 Ill. App. 3d 529, 357 N.E.2d 571 (1976). There, a trial judge found that a police officer acted in a wilful and wanton manner in failing to use his siren. In that case, the officer had been pursuing a vehicle at speeds beyond the posted limit when he collided with the plaintiff's car. The *Kirshenbaum* case is inapposite for many reasons. The decision resulted from a bench trial; hence, there was no special interrogatory. Furthermore, the trial judge specifically found the officer in that case to have acted in a wilful and wanton manner.

We construe special interrogatories "in light of what an ordinary person would understand them to mean, and not on the basis of *** abstract mathematical analysis." *LaPook*, 211 Ill. App. 3d at 866. We believe the language of the special interrogatory is both plain and clear. It asks whether Ford or Bonner or both were wilful and wanton. The jury's negative answer is not consistent with any hypothesis that the jury may have found that one of these men was acting appropriately and the other was not. On the contrary, such an understanding by the jury would have required an affirmative answer to the inquiry.

■ The plaintiff argues that because the interrogatory "fails to limit the inquiry to before and at the time of the occurrence," the jurors may have assessed the officers' conduct as to time periods that were not relevant to the inquiry before them. The plaintiff failed to raise an objection to this matter of form before the trial judge during the instruction conference, and it is, therefore, waived for review. *LaPook*, 211 Ill. App. 3d at 864. However, as with her previous contention, we must examine the substance of the claim to determine whether, with regard to the time-frame issue, the jury's answer to the interrogatory is consistent with the general verdict.

We construe a special interrogatory within the context of all of the instructions to determine how it was understood by the jury. *LaPook*, 211 Ill. App. 3d at 856; *Vuletich v. Bolgla*, 85 Ill. App. 3d 810, 817, 407 N.E.2d 566 (1980). We believe a properly instructed jury, like the one here, would logically consider events during the time and circumstances surrounding the plaintiff's case. In *Stephenson v. Air Products & Chemicals, Inc.*, 114 Ill. App. 2d 124, 252 N.E.2d 366 (1969), relied upon by the plaintiff, the absence of a time frame from the rejected interrogatory was confusing because the jury was being asked to assess damages for an injury that resulted from negligence occurring five years before the injury. Also, as the defendant notes, to the extent the interrogatory may have expanded the time frame the jury could consider, it offered the plaintiff a larger window of time within which to prove her case.

■ Finally, the plaintiff contends that the failure of the interrogatory to include all of the policemen involved in the pursuit of Massie's car renders the jury's answer of no consequence. The plaintiff explains that the jury's general verdict reflects that it found that an agent of the defendant was guilty of wilful and wanton conduct. Thus, because other officers responded to Officer Bonner's radio call and the evidence indicates that none of them sounded a siren, the answer as to Ford and Bonner is not inconsistent with the general verdict, which indicated that the jury believed that some other officer acted in a wilful and wanton manner.

The trial judge rejected this form of the interrogatory because he believed that Detective Ford and Officer Bonner were the only officers involved in the pursuit of Massie. We review a judge's decision not to give an interrogatory as a question of law. 735 ILCS 5/2—1108 (West 1994). Generally, a trial judge has no discretion to reject a special interrogatory that is proper in form. *Pry v. Alton & Southern Ry. Co.*, 233 Ill. App. 3d 197, 598 N.E.2d 484 (1992). Likewise, however, it is error for a trial judge to submit a special interrogatory on an issue when the record contains no evidence upon which the

jury could rely to answer the question. *Paul v. Garman,* 310 Ill. App. 447, 34 N.E.2d 884 (1941); *Nosko v. O'Donnell,* 260 Ill. App. 544 (1931). Here, there is simply no evidentiary basis to support a conclusion that anyone other than Officer Bonner and Detective Ford acted in a wilful and wanton manner. Although other officers may have responded to Bonner's radio call, there is no evidence that any of them were in pursuit of Massie's car, as that term is defined in General Order 81—8:

> "A motor vehicle pursuit is an active attempt by an officer operating a Department vehicle to apprehend any driver or operator of a motor vehicle who, having been given a visual or audible signal by the officer directing such driver or operator to bring his vehicle to a stop, willfully fails or refuses to obey such direction." General Order 81—8, § VI(C).

General Order 81—8 does not require all officers who are aware of or who observe a pursuit to begin sounding their sirens to generally warn the public. Thus, evidence that police personnel other than Ford and Bonner did not sound their sirens as they converged on the suspects does not constitute evidence of their wilful and wanton conduct. The trial judge did not err in limiting the special interrogatory to Ford and Bonner.

■ The plaintiff next contends that there was no evidentiary basis for the jury's negative response to the special interrogatory, and, therefore, she was entitled to judgment. In order to establish that the jury's verdict was against the manifest weight of the evidence, the plaintiff must show that "the opposite conclusion is clearly evident or the findings of the jury are unreasonable, arbitrary and not based on any evidence." *DiMarco v. City of Chicago,* 278 Ill. App. 3d 318, 325, 662 N.E.2d 525 (1996). Here, the evidence amply supports the jury's answer to the special interrogatory.

The jury was instructed that, to find for the plaintiff, it had to conclude that the defendant had engaged in "a course of action which shows an utter indifference to or conscious disregard for the safety of others." Our courts have interpreted this to mean that a plaintiff must prove that the defendant's conduct was reckless (*Ziarko v. Soo Line R.R. Co.,* 161 Ill. 2d 267, 273-74, 641 N.E.2d 402 (1994)), and by deliberately inflicting "a highly unreasonable risk of harm" on the plaintiff, "approache[d] the degree of moral blame attached to intentional harm." *Burke v. 12 Rothschild's Liquor Mart, Inc.,* 148 Ill. 2d 429, 448, 593 N.E.2d 522 (1992).

Here, the evidence showed that Detective Ford and Officer Bonner stopped their squad car behind another car the occupants of which were suspected of illegal activity. When the officers left their

vehicle, a passenger in that car pointed a gun toward Detective Ford. Massie sped away from the police officers, who were left standing in the street. The officers returned to their car, and with oscillating headlights engaged, began to follow Massie. The officers testified that they never exceeded 35 miles per hour as they followed Massie. They briefly stopped at red lights and otherwise obeyed safety rules, as dictated by General Order 81—8. The plaintiff presented no witnesses who testified otherwise.

The officers' testimony as to their speed and conduct is supported not only by their testimony that Massie's lead over the officers doubled during the course of the pursuit, but by that of Officer Hampton, who stated that the accident occurred while Ford and Bonner were around 57th Street, nearly two blocks away. Although the passenger in the taxi hit by Massie's car testified that the police arrived very quickly at the scene of the accident, we note that the pursuit did not cover a vast distance.

We believe the evidence in the record shows the officers' due regard for the safety of the general population. The sole basis in the record upon which the plaintiff seeks to hold the defendant liable is that Detective Ford's failure to activate his siren, in and of itself, constituted wilful and wanton conduct.

■ The plaintiff asserts that Ford's action was in violation of section 12—601(b) of the Illinois Vehicle Code, which states that the operator of an emergency vehicle, when pursuing a suspected violator of the law "shall sound [his] siren *** *when necessary* to warn pedestrians and other drivers." (Emphasis added.) 625 ILCS 5/12—601(b) (West 1994). Although it is unclear whether the plaintiff offered this statute as an evidentiary basis in the trial court, clearly, it contemplates that operators of emergency vehicles will exercise discretion in using their sirens. This is in accord with our case law, under which the failure of a police officer to activate a siren during a pursuit, without more, is not evidence of wilful and wanton conduct. *E.g. Valiulis v. Scheffels*, 191 Ill. App. 3d 775, 789-90, 547 N.E.2d 1289 (1989).

Also, in *Kirshenbaum v. City of Chicago*, the court upheld a finding that a police officer who collided into an oncoming vehicle while pursuing it was wilful and wanton for failing to activate his siren. The record in that case contained evidence that the angle of the morning sun would have blinded oncoming cars. *Kirshenbaum*, 43 Ill. App. 3d at 532-34. Here, there was no evidence to show that Detective Ford's activation of his siren would have successfully warned people who were at least two blocks away that *Massie* was approaching. In fact, Ford stated that one of the reasons he did not activate

his siren was that he did not think it would act as a successful warning given the distance between his car and Massie's.

We also do not believe that Detective Ford's "violation" of General Order 81—8, section VI(D)(2)(a)(2), in and of itself, constituted wilful and wanton conduct. That section requires operators of unmarked police vehicles to activate their siren when engaged in a pursuit. We note, initially, that the record could have supported a reasonable finding by the jury that Ford and Bonner were not "pursuing" Massie. The evidence shows that Ford did not travel at speeds equal to Massie. Furthermore, Ford stopped his car for traffic signals. He testified that he did not consider himself to be in pursuit of Massie, although we recognize that in arrest reports filled out in conjunction with the incident, Ford wrote that he was in pursuit.

Even assuming the jurors found that Ford and Bonner were pursuing Massie, they could have reasonably accepted, as evidence of due care, Ford's explanation for not turning on his siren. Ford stated that he wanted to avoid alarming other drivers, who might slam on their brakes, thus increasing the danger of the situation. As we noted earlier, Ford also believed that he was unlikely to apprehend Massie because Massie was far ahead of Ford's squad car.

While section VI(D)(2)(a)(2) speaks in mandatory terms, we cannot conclude that an officer's reasoned determination not to follow its dictates amounts to evidence of wilful and wanton conduct *per se*. Violation of a statute does not constitute *negligence per se* because the evidence of violation may be rebutted by proof that a party acted reasonably under the circumstances. *Leaks v. City of Chicago*, 238 Ill. App. 3d 12, 18, 606 N.E.2d 156 (1992). Indeed, the violation of self-imposed rules or internal guidelines, such as General Order 81—8, does not normally impose a legal duty, let alone constitute evidence of negligence, or beyond that, wilful and wanton conduct. *Blankenship v. Peoria Park District*, 269 Ill. App. 3d 416, 422-23, 647 N.E.2d 287 (1995).

In regard to the evidence in this case, we reiterate that which this court stated recently:

" 'In order for a defendant's acts or omissions to be characterized as wilful or wanton, they must have been committed with actual or deliberate intention to harm or with an utter indifference to or conscious disregard for the safety of others. [Citation.] In evaluating the conduct of the police officers here, we must be mindful of the reason for their pursuit of [Massie]. The evidence *** establishes that [Massie] was driving his car in a reckless manner and endangering the public before the police began to chase him.' " *Urban v. Village of Lincolnshire*, 272 Ill. App. 3d

1087, 1095, 651 N.E.2d 683 (1995), quoting *Breck v. Cortez*, 141 Ill. App. 3d 351, 360-61, 490 N.E.2d 88 (1986).

As in the *Urban* case, the record simply contains no evidence that Detective Ford or Officer Bonner acted in the manner required for the plaintiff to recover. Rather, the evidence is to the contrary, and the jury's answer to the special interrogatory must govern the general verdict.

Even were we to conclude otherwise, we agree with the defendant that the record contains absolutely no evidence upon which the jury could rely to conclude that any action by the police officers in this case was the proximate cause of the plaintiff's injuries. When the plaintiff received her injuries, the police were approximately two blocks away from her and Massie's car. The absence of a siren did not impact on Massie's actions in driving through a red light and into oncoming traffic. While the officers' initial actions in stopping behind Massie's car may have served as the impetus for Massie to act as he did in speeding from the scene, Massie's subsequent actions, alone, caused this tragedy. There is no evidence that the actions of the officers were a proximate cause of the plaintiff's injuries. *Thompson v. County of Cook*, 154 Ill. 2d 374, 382-83, 609 N.E.2d 290 (1993); *Nelson v. Thomas*, 282 Ill. App. 3d 818, 668 N.E.2d 1109 (1996). Thus, were we to have held otherwise as to the special interrogatory, we would conclude, as urged by the defendant, that the jury's general verdict was against the manifest weight of the evidence.

■ As a final matter, we address the plaintiff's contention that the trial judge erred in entering summary judgment on her negligence count against the defendant. Of course, the defendant's employees and agents are immunized in this regard by section 2—202 of the Tort Immunity Act, so long as they are engaged in the "execution or enforcement of any law." 745 ILCS 10/2—202 (West 1994). The plaintiff contends that the police officers involved in pursuing Massie were not engaged in law enforcement at the time.

Here, the police suspected Massie and his passengers of being involved in drive-by shootings. Massie's car was blocking the road when Detective Ford stopped behind him, activating his oscillating lights, a recognizable sign of police activity. One of Massie's passengers drew a gun on Detective Ford, and Massie sped off, violating numerous traffic laws. Detective Ford followed. These facts, as well as our case law, establish that any contention that the police involved here were not engaged in law enforcement is utterly baseless. See, e.g., *Fitzpatrick v. City of Chicago*, 112 Ill. 2d 211, 221, 492 N.E.2d 1292 (1986); *Bruecks v. County of Lake*, 276 Ill. App. 3d 567, 658 N.E.2d 538 (1995); *Urban*, 272 Ill. App. 3d at 784-85.

For all of the foregoing reasons the judgment of the circuit court is affirmed.

Affirmed.

ZWICK, P.J., and McNAMARA, J., concur.