2017 IL App (1st) 170537
No. 1-17-0537
Opinion filed December 29, 2017

FOURTH DIVISION

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| ROBERT HOFFMAN, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NORTHEAST ILLINOIS REGIONAL | ) | No. 14 L 5879 |
| COMMUTER RAILROAD | ) | |
| CORPORATION d/b/a METRA, | ) | |
| | ) | The Honorable |
| | ) | Claire E. McWilliams, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE GORDON delivered the judgment of the court, with opinion.
Justices McBride and Ellis concurred in the judgment and opinion.

**OPINION**

¶ 1        Plaintiff Robert Hoffman sued defendant Northeast Illinois Regional

Commuter Railroad Corporation (Metra), alleging negligence when a Metra

ticket agent stepped backward on a train platform, bumping into plaintiff and causing plaintiff to fall and break his hip. After a jury trial, the jury returned a verdict in favor of plaintiff and against defendant, and assessed damages totaling $500,000, which were itemized as follows: (1) past medical expenses, $54,263.70; (2) future medical expenses, $70,000; (3) past pain and suffering, $45,736.30; (4) future pain and suffering, $30,000; (5) past loss of normal life, $100,000; (6) future loss of normal life, $100,000; and (7) disfigurement, $100,000. However, the jury found plaintiff 50% responsible and reduced his total recoverable damages to $250,000.

¶ 2        Defendant filed a posttrial motion: (1) seeking a new trial on the ground that the trial court erred in allowing evidence of defendant's internal safety rules and regulations; or (2), in the alternative, seeking a remittitur of the damages that the jury awarded plaintiff for future medical expenses. The trial court denied the motion, and defendant raises the same two claims on this appeal. For the following reasons, we affirm.

¶ 3                                    BACKGROUND

¶ 4        In its appellate brief, plaintiff did not include a statement of facts. The following facts were established at trial and do not appear to be in dispute on appeal. Ill. S.Ct. R. 341(i) (eff. Jan. 1, 2016) (a statement of facts "need not be

included" in an appellee's brief "except to the extent that the presentation by the appellant is deemed unsatisfactory" by the appellee).

¶ 5        Plaintiff, a 68-year old resident of Fox Lake, Illinois, departed his home early in the morning of Saturday, June 8, 2013, to walk to a nearby McDonald's restaurant. This destination caused him to walk past the Metra station in Fox Lake.

¶ 6        Richard Davis, a Metra employee for 27 years, worked as the ticket agent at the Fox Lake station, where he had been stationed since 1991. On June 8, 2013, the day in question, Davis arrived at the station at 4:35 a.m. and did not initially notice anyone on the platform. However, at 5 a.m., Davis observed a man in a sleeping bag on the platform, who was lying parallel to the train tracks. The tracks are below the platform, but the platform is at ground level. The platform consists of brick pavers and, at some point, the pavers end and merge with the sidewalk, which is made of concrete.

¶ 7        Sometime before 5:30 a.m., Davis exited the station in order to ask the sleeping man to move. Davis walked south, on the brick pavers located on the west side of the tracks. As Davis exited the station, Davis noticed plaintiff, whom Davis had observed walking past the station on other occasions. When Davis reached the man in the sleeping bag, Davis asked him to leave the platform. As the man started to stand up, Davis took a step back and, thereby,

bumped into plaintiff who, unknown to Davis, was right behind Davis. It is undisputed that Davis did not look behind him before stepping back. Plaintiff fell to the ground, and Davis and another person helped plaintiff to a nearby bench.

¶ 8    It was plaintiff's plan to sit for a while and rest. However, after the 10:45 a.m. train came and went, a Metra police officer approached; and eventually an ambulance transported plaintiff to a hospital where he was diagnosed with a fractured hip.

¶ 9    On June 3, 2014, plaintiff filed a complaint against defendant alleging that Davis, a Metra employee, breached a duty of care to plaintiff when Davis stepped backward without looking, thereby causing plaintiff to fall. Metra answered and asserted that plaintiff was contributorily negligent.

¶ 10    Prior to trial, defendant filed a motion *in limine* on September 13, 2016, seeking to bar plaintiff from introducing evidence or argument concerning defendant's internal safety rules. On the day in question, defendant had an employee safety manual entitled "Safety Rules and General Procedures Manual." Rule 1.12 in the manual required defendant's employees to:

> "be careful to prevent injury to themselves or others. They must be alert and attentive when performing their duties and plan their work to avoid injury."

¶ 11    Rule 100.9.3 stated:

"Elevated Places, Stairs, Doors and Elevators: The following requirements when walking on an elevated place, walking on stairs, using a door or riding elevators: Rule Number 1, when walking on engines, cars, scaffolds, or other elevated places, (A) look before you step in any direction."

¶ 12    In connection with its pretrial motion, defendant argued to the trial court that its internal safety rules were not relevant to plaintiff's claims because the rules were developed for the safety of its employees not for the safety of the general public. The trial court denied defendant's motion.

¶ 13    Prior to opening statements on September 14, 2015, defendant renewed its motion seeking to bar plaintiff "from making any comment *** that a violation of Metra's *** rules or internal guidelines constitutes negligence and/or imposes a legal duty on the defendant." The trial court denied defendant's motion, stating: "this is routinely and customarily and properly used to show evidence of negligence in a case. This motion is denied."

¶ 14    Since most of the facts in this case are undisputed on this appeal, we focus below on the evidence and arguments at trial concerning the two points of contention on appeal: the admission of defendant's safety rules; and the sufficiency of the evidence concerning defendant's future medical expenses.

¶ 15    During opening remarks, plaintiff argued, among other things:

"We're here today because we're suing Metra. Rich Davis was an employee of Metra when he broke a safety rule. A railroad company acts through its employees. We know that Metra violated this rule because Rich Davis told us. He'll tell you as well. He'll tell you that he took— he'll tell you that he did not look when he took a step backwards."

¶ 16    During the ensuing trial, plaintiff questioned Davis at length about defendant's safety rules. For example, plaintiff asked Davis concerning Rule 100.9.3, as follows:

"PLAINTIFF'S COUNSEL: And when it comes to Rule 100.9.3, 'Elevated Places, Stairs, Doors and Elevators, the rule states: The following requirements when walking on an elevated place, walking on stairs, using a door or riding elevators: Rule Number 1, when walking on engines, cars, scaffolds or other elevated places, (A) look before you step in any direction.'

Does that rule apply to you on June 8, 2013?

DAVIS: I don't know how you can call a platform an elevated structure, sir."

¶ 17    Plaintiff's counsel continued to ask Davis about this particular rule:

"PLAINTIFF'S COUNSEL: Looking back at Rule 100.9.3, elevated places, stairs, doors and elevators you have already testified I think to the Members of the Jury that a platform is elevated from the tracks and the ballast; isn't that right?

DAVIS: I don't know how a platform could be considered an elevated area.

PLAINTIFF'S COUNSEL: Would you agree, Mr. Davis, that a platform is elevated above the rocks [supporting the tracks]?

DAVIS: Yes, it is.

PLAINTIFF'S COUNSEL: And would you agree then that it's important in order for someone not to fall off the platform onto the track and ballast and then rock, correct—

DAVIS: Yes.

PLAINTIFF'S COUNSEL: —on the track and ballast, that they follow Rule 100.9.3?

DEFENSE COUNSEL: Objection, relevance.

THE COURT: Overruled. You can answer.

DAVIS: It's important, yes.

PLAINTIFF'S COUNSEL: With that understanding, would you agree then on June 8, 2013, when you walked out onto the platform that Rule 100.9.3 applied to you, Mr. Davis?

DAVIS: I honestly don't think it applied to me, no, sir.

PLAINTIFF'S COUNSEL: Why not?

DAVIS: Again, it's the argument—I shouldn't say argument, but it's the difference or the disagreement of what an elevated platform— whether a platform is elevated or not.

When you get down to the street, it's street level and comes up. So I don't consider that an elevated—it's not my interpretation of that, Counselor."

¶ 18    With respect to plaintiff's injury, Dr. Harpeet Basran, defendant's treating orthopedic surgeon, testified by means of a videotaped evidence deposition. Basran testified that he first examined plaintiff on June 8, 2013, the day of the incident, and that plaintiff's x-ray revealed a fracture of the right hip. Basran testified that he explained plaintiff's options as follows: "Broadly, it would be surgical versus nonsurgical treatment, and after deciding on surgical management, it was then a discussion of either internal fixation with screws or a replacement or an arthroplasty-type procedure." Basran explained: "Internal fixation involves reducing the fracture and realigning it and placing screws or

hardware internally into the bone to help stabilize and hold it in place." Basran also explained that an arthroplasty "involve[s] removing the broken portion of the hip and the portion of the remainder of the femur and replacing that broken piece with a new implant or a new joint replacement."

¶ 19    Basran testified that plaintiff decided on internal fixation and Basran performed that procedure on June 9, 2013, the day after the incident. The next date that Basran examined plaintiff was June 27, 2013, when plaintiff reported that "he was doing well and was having no pain." At that time, plaintiff was "working in an inpatient facility with rehab exercises." During the June 27, 2013, examination, Basran found that plaintiff "had no pain with flexion, extension, rotation or arial loading, and incisions had healed over with no signs of infection and no swelling."

¶ 20    Basran testified that, on June 27, 2013, he ordered x-rays which revealed: "some collapse and some migration of the hardware coming out and some collapse of the fracture through this area from the time of surgery." Basran testified that this was "[a] bit of concern," and he explained to plaintiff the "importance of taking the pressure off of his right leg, and that it was a critical time and wanted to insure that there was no further collapse or need for further surgeries." Basram testified that he examined plaintiff on July 1, 2013, July 23, 2013, and September 3, 2013.

¶ 21 Basram testified that, on September 3, 2013, which was almost two months after the incident, plaintiff "stated that he was doing well and now at home. He had been applying full weight without any assistive devices, without any pain or limitations. He did take narcotic medications on days of therapy ***." Basram discussed using a heel lift, which is "an insert to make up for a limb length deficiency" because plaintiff was "having some collapse or shortening through the fracture leaving his two legs at a different length." Later in September, plaintiff requested a wheelchair.

¶ 22 Basram testified that he examined plaintiff on November 22, 2013, February 24, 2014, and August 26, 2014, which was over a year after the initial injury. On August 26, 2014, Basram found that plaintiff's "incisions had healed without infection [and] with no tenderness to any bony prominences and no pain with flexion, extension or arial loading of the hip."

¶ 23 Basram testified that the x-ray taken on August 26, 2014, revealed that:

"There has been a change from his last x-rays to this x-ray, and I think the easiest way to tell is the amount of hardware that's exposed from the bone. The length of the screw is exactly the same, but more of it is coming out from the outside of the bone which means that the actual break is actually collapsing, and that was my concern that with more

prominent hardware his fracture was going on to collapse and become shorter and shorter."

¶ 24    Basram testified that, on August 26, 2014, they "discussed the collapse and the possibility of hardware removal and replacement, but at that point we had decided to continue with observation." Basram examined plaintiff again on July 19, 2016, and August 16, 2016. On August 16, 2016, plaintiff was experiencing more pain and using an assistive device to walk, and the x-rays revealed "more collapse and more migration of the hardware." As a result, Basram recommended surgery "to have the hardware removed and the joint replaced."

¶ 25    Basram testified that, in his notes for July 19, 2016, and August 16, 2016, he had remarked that plaintiff was using an assistive device but he did not write down whether the device was a wheelchair, walker or cane, and he did not recall which one it was.

¶ 26    Basram testified as follows about future medical care:

"PLAINTIFF'S COUNSEL: Doctor, do you have an opinion based upon a reasonable degree of medical and surgical certainty whether [plaintiff] will need future medical treatment for his *** fracture?

BASRAM: Yes.

PLAINTIFF'S COUNSEL: What is that?

BASRAM:  I believe [plaintiff] is going to require the hardware removal and arthroplasty procedure for his hip."

Basram testified that plaintiff was considering surgery in January 2017, but Basram did not testify about the projected cost of plaintiff's future medical treatment.

¶ 27    Basram testified that plaintiff had also experienced a stroke at some point prior to Basram's initial consultation with plaintiff.  With respect to the prior stroke, Basram was asked:

"DEFENSE COUNSEL:  Doctor, in your treatment of [plaintiff], did you note a previous stroke of 2006?

BASRAM:  I knew that he had a prior stroke on my initial evaluation, but I didn't have the date of it at the time of my consultation.

DEFENSE COUNSEL:  And in your experience, would a cane be useful as an assistive device for someone who is suffering deficits from a stroke?

BASRAM:  Yes, it can be.

DEFENSE COUNSEL Would it be less effective than a wheelchair?

BASRAM:  Yes.

DEFENSE COUNSEL: If [plaintiff] was experiencing left-sided weakness as a result of his stroke, would you think that a wheelchair would be more effective?

BASRAM: Yes."

Defendant does not raise any issues regarding the stroke on appeal.

¶ 28    Defendant called its own medical expert, Dr. Gary Klaud Miller, an orthopedic surgeon, who also testified through a videotaped evidence deposition. When Miller was asked whether, based on his review of the records, plaintiff would require surgery in the future, Miller answered that it was "possible." On cross, Miller admitted that he had been hired at least 12 times in the last five years by defendant to offer medical opinions. Miller also agreed that, based upon his experience and his review of the records, plaintiff's treatment to date had been reasonable and that he had "no reason to disagree" with the fall on June 8, 2013, as the cause of plaintiff's fracture. Miller also recalled reading that one of plaintiff's doctors had written in his notes that, prior to the accident, plaintiff "could walk five to six miles a day." Like Basram, Miller also did not discuss future medical costs.

¶ 29    Prior to the close of evidence, plaintiff's counsel read the following stipulation before the jury concerning past medical expenses:

"PLAINTIFF'S COUNSEL: Morning. This hereby stipulated and agreed to between the parties for this case that the following medical bills incurred by [plaintiff] were reasonable for [plaintiff's] conditions and that the following are the total bills for each provided listed and the said charges were the usual and customary charges for the type of treatment [plaintiff] received.

Alden Terrace, Anesthesia Associates of Crystal Valley, Centegra Physician Care, Integrated Rehab, Lake McHenry Pathology Associates, McHenry Orthopedics, Dr. Basran and Centegra Hospital McHenry. The grand total of these charges ws $54,263.70.

According to the table of mortality of evidence, the life expectancy of a person age 67, white male, is 16 years."

¶ 30     Plaintiff then moved into evidence the supporting exhibits, including the "life tables" and "the medical bills summary," and the trial court admitted them into evidence.

¶ 31     During closing argument, plaintiff argued with respect to medical costs:

"Now, the first category is past medical expenses, and that one is easy, those are the bills, those are what I just read to you. And we know to cover those medical bills, it's going to be $54,263.70.

We know that [plaintiff] now needs a hip replacement, that the screws in his hip have migrated outside, that the bone has collapsed. Dr. Barsan has recommended a second surgery, Dr. Klaud Miller had nothing to say about it. So the only evidence, what's more probably true than not, is that [plaintiff] needs a second surgery and care. And we ask you for $70,000 to cover that cost."

¶ 32 During closing arguments, plaintiff argued with respect to defendant's safety rules: "So Mr. Davis admits that he stepped backwards without looking. He admits that he violated that important safety rule which is intended to prevent people from falling, to prevent people from becoming injured. And because of that, we know that [plaintiff] fell."

¶ 33 Over defendant's objection, the trial court agreed to give plaintiff's proposed instructions and verdict forms regarding future medical costs. On appeal, defendant raises no issues with respect to the jury instructions or verdict forms, except to argue that there was no evidence to support the jury's award of future medical costs. For example, defendant objected to "Verdict Form B," which stated in full:

"We, the jury, find for the plaintiff [name] and against the defendant [name] and further find the following:

First: Without taking into consideration the question of reduction of damages due to the negligence of [plaintiff], we find that the total amount of damages suffered by [plaintiff] as a proximate result of the occurrence in question is __$, itemized as follows:

[1] Past Medical Expenses: $___

[2] Future Medical Expenses: $___

[3] Past Pain and Suffering: $___

[4] Future Pain and Suffering: $___

[5] Past Loss of Normal Life: $___

[6] Future Loss of Normal Life: $___

[7] Disfigurement: $___

Second: Assuming that 100% represents the total combined negligence of all persons whose negligence proximately contributed to the plaintiff's injuries, including [plaintiff] and [defendant's], we find that the percentage of such negligence attributable solely to [plaintiff] is ___(%).

Third: After reducing the total damages sustained by [plaintiff] by the percentage of negligence attributable solely to [plaintiff], we assess [plaintiff's] recoverable damages in the sum of ___$. "

The above form was one of the verdict forms tendered by the trial court to the jury, and it was the one returned signed by the jury at the conclusion of the trial.

¶ 34       The jury found for plaintiff and against defendant, and found that the total amount of damages suffered by plaintiff was $500,000, itemized as follows: (1) past medical expenses, $54,263.70; (2) future medical expenses, $70,000; (3) past pain and suffering, $45,736.30; (4) future pain and suffering, $30,000; (5) past loss of normal life, $100,000; (6) future loss of normal life, $100,000; and (7) disfigurement, $100,000. As noted, the only line that defendant challenges on this appeal is the second line, which was $70,000 for future medical expenses.

¶ 35       The jury then found that plaintiff was 50% responsible and that, after reducing the total damages by the percentage of negligence attributable to him, his total recoverable damages was $250,000. Since the jury reduced plaintiff's damages by half, the amount disputed on appeal for future medical expenses is only $35,000.

¶ 36       On October 17, 2016, defendant filed a posttrial motion: (1) seeking a new trial on the ground that the trial court erred in allowing the introduction of evidence on defendant's internal safety rules and regulations; or (2), in the alternative, seeking a remittitur of the damages that the jury awarded plaintiff

for future medical care. The trial court denied the motion, and this appeal followed raising the same two claims.

¶ 37                                    ANALYSIS

¶ 38        On this appeal, defendant argues: (1) for a new trial, on the ground that the trial court erred in allowing evidence of defendant's internal safety rules and regulations; or (2), in the alternative, for a remittitur of the damages that the jury awarded plaintiff for future medical care. For the following reasons, we affirm.

¶ 39                                 I. Safety Rules

¶ 40        First, defendant argues that the trial court erred by allowing plaintiff to introduce evidence of defendant's internal safety rules and regulations, and that the trial court subsequently erred by denying defendant's posttrial motion for a new trial on this ground.

¶ 41        Evidentiary rulings are generally reviewed for an abuse of discretion. *Diaz v. Legat Architects, Inc.*, 397 Ill. App. 3d 13, 45 (2009); *Bulger v. Chicago Transit Authority*, 345 Ill. App. 3d 103, 110 (2003). In addition, a reviewing court will generally not reverse a trial court's ruling on a motion for a new trial, unless the trial court abused its discretion. *Kindernay v. Hillsboro Area Hospital*, 366 Ill. App. 3d 559, 569-70 (2006). An abuse of discretion occurs only when the trial court's ruling is arbitrary, fanciful, unreasonable, or where

no reasonable person would take the view adopted by the trial court. *In re Marriage of Heroy*, 2017 IL 120205, ¶ 24.

¶ 42 If we decide that the trial court's evidentiary ruling was in error, we must then consider whether the error was harmless. *Ready v. United/Goedecke Services, Inc.*, 238 Ill. 2d 582, 592 (2010); *Nolan v. Weil-McLain*, 233 Ill. 2d 416, 429 (2009) ("if the circuit court erred in excluding this evidence, we must determine if that error is harmless or reversible."); *Bulger*, 345 Ill. App. 3d at 110-11 (even if evidence was improperly admitted, a reviewing court will reverse only if it "affected the outcome of the trial"); *McDonnell v. McPartin*, 192 Ill. 2d 505, 535 (2000) (although the trial court erred in permitting certain questions, the error was harmless). If we conclude that a properly conducted trial would not have led the jury to a different verdict, we will affirm. *Ready*, 238 Ill. 2d at 592. Also, a reviewing court may affirm the judgment of the trial court on any basis found in the record. *In re Marriage of Heroy*, 2017 IL 120205, ¶ 24.

¶ 43 In support of its argument that the trial court abused its discretion in allowing evidence of defendant's internal safety rules, defendant cites several cases, but these cases do not stand for the proposition cited. For example, defendant's brief argues that "[t]he violation of self-imposed internal rules or guidelines is not evidence of negligence," and it cites in support *Morton v. City*

*of Chicago*, 286 Ill. App. 3d 444, 454 (1997).  However, *Morton* does not state that and does not stand for that proposition.  In *Morton*, this court explained that the violation of a police department's internal rule, "in and of itself," did not constitute proof of "willful and wanton conduct" by a police officer.  *Morton*, 286 Ill. App. 3d at 454.  We found that the violation was not "evidence of willful and wanton conduct *per se*."  *Morton*, 286 Ill. App. 3d at 454.  However, we did not find in *Morton* that the trial court had abused its discretion by allowing this evidence before the jury.

¶ 44   Defendant's brief misquotes *Morton* as stating:  "[t]he violation of self-imposed rules or internal guidelines does not normally impose a legal duty and thus *would not constitute negligence*[.]"[1]   (Emphasis added in defendant's brief.)   What the quote actually states is:  "[t]he violation of self-imposed rules or internal guidelines *** does not normally impose a legal duty, let alone constitute evidence of negligence or beyond that, willful and wanton conduct."  *Morton*, 286 Ill. App. 3d at 454.  The key word in that quote is "alone."  As noted above, the *Morton* court held that a violation of an internal rule, by itself, did not constitute proof of willful and wanton conduct.

¶ 45   Similarly, defendant cites *Luss v. Village of Forest Park*, 377 Ill. App. 3d 318, 336 (2007), where this author stated:  "It is well established that violation

_____

[1] Later in the brief, defendant quotes the statement correctly.

of self-imposed rules or internal guidelines ' "does not normally impose a legal duty, let alone constitute evidence of negligence, or beyond that, willful and wanton conduct." ' " *Luss v. Village of Forest Park*, 377 Ill. App. 3d 318, 336 (2007) (quoting *Wade v. City of Chicago*, 364 Ill. App. 3d 773, 781 (2006), (quoting *Morton*, 286 Ill. App. 3d at 454)). Again, the key word in the quote is "alone." In *Luss*, this court's finding was that the violation of an internal guideline did not, by itself, create a material issue of fact barring summary judgment. *Luss*, 377 Ill. App. 3d at 336, 338.

¶ 46    Defendant also cites *Bulger*, where the issue was whether the trial court had properly admitted "evidence of post-accident remedial measures." *Bulger*, 345 Ill. App. 3d at 110-12. The *Bugler* court observed that "[i]n general, evidence of post-accident remedial measures is not admissible to prove prior negligence," but that there were several exceptions to this general rule. *Bulger*, 345 Ill. App. 3d at 111. The *Bulger* court found that none of the exceptions to the rule applied and, thus, it was error to admit the evidence. *Bulger*, 345 Ill. App. 3d at 117. Unlike *Bulger*, there was no evidence of post-accident remedial measures admitted in the case at bar. Thus, *Bulger* does not apply here.

¶ 47    In *Hudson v. City of Chicago*, this court explained the difference between cases like *Morton* and *Luss* on the one hand, where we found that a violation of

21

an internal safety rule did not constitute evidence of willful and wanton conduct *per se*, and cases like the one before us and *Hudson* itself, where the violation of an internal safety rule could still constitute "some evidence" of negligence. *Hudson v. City of Chicago*, 378 Ill. App. 3d 373, 405 (2007). In *Hudson*, this court discussed *Morton* at length and explained what it stood for:

"We agree that countermanding a police department general order does not constitute negligence or willful and wanton conduct *per se*. This has been established in *Morton v. City of Chicago*, 296 Ill. App. 3d 444, 454 (1997). However, *Morton* implicitly indicates that a violation of an internal police department rule can constitute some evidence of willful and wanton conduct. The court in that case stressed that violations of a police department general order would not 'in and of itself' constitute willful and wanton conduct, that the jury could have found that there was a valid reason for the officer in that case not following the general order and that 'the violation of self-imposed rule or internal guidelines *** does not *** alone constitute evidence of negligence, or beyond that, willful and wanton conduct. [Citation.]' *Morton*, 286 Ill. App. 3d at 454. Thus, *Morton* impliedly stands for the proposition that, although a violation of an internal rule will not automatically constitute willful and wanton conduct, a jury may consider it along with other evidence in reaching a

22

determination of willful and wanton conduct." *Hudson*, 378 Ill. App. 3d at 405.

¶ 48 Similarly, in the case at bar, the jury was free to accept Davis' testimony that the particular rule in question did not apply to him and that he also had "a valid reason" for moving quickly in this particular situation, namely, because a homeless man was suddenly standing up in front of him. See *Hudson*, 378 Ill. App. 3d at 405. By the same token, the jurors were also free to reject it and consider the rule, "along with other evidence," in reaching their determination that defendant was 50% responsible for the incident. See *Hudson*, 378 Ill. App. 3d at 405.

¶ 49 Even if we were to find that the trial court erred by admitting defendant's internal safety rule, we would need to find that its admission affected the outcome of the trial before we could reverse. *E.g.*, *Bulger*, 345 Ill. App. 3d at 110-11 (even if evidence was improperly admitted, a reviewing court will reverse only if it "affected the outcome of the trial"). Also, defendant asks us to consider whether this evidence should have been barred pursuant to Illinois Rule of Evidence 403, which permits a trial court to bar otherwise relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Ill. R. Evid.403 (eff. Jan. 1, 2011). A trial court's balancing determination pursuant to

Rule 403 is also subject to an abuse-of-discretion standard of review. *People v. Walker*, 21 Ill. 2d 317, 328, 330-31, 337-38 (2004). On the particular facts of this case, we cannot find harm pursuant to the harmless error rule, or prejudice or confusion under Rule 403.

¶ 50    The issue here concerned whether it was negligent for a person to take a step back, as a homeless man stood up, without first looking backward. This is not rocket science or brain surgery or a matter upon which a juror might feel that the expertise contained in an industry rule was crucial or dispositive. See *Kindernay v. Hillsboro Area Hospital*, 366 Ill. App. 3d 559, 571 (2006) (in a medical malpractice case, expert testimony is generally needed because "jurors are not skilled in the practice of medicine and would find it difficult" without help to determine a lack of "scientific skill"). Most jurors at some time in their lifetimes have had the experience of taking a step backwards. Thus, even if we were to find error here, we could not find that the introduction of this evidence, in light of the particular facts of this case, affected its outcome. *Bulger*, 345 Ill. App. 3d at 110-11 (even if evidence was improperly admitted, a reviewing court will reverse only if it "affected the outcome of the trial").

¶ 51                                    II. Remititur

¶ 52        Next, defendant argues in the alternative for a remittitur of the damages that the jury awarded plaintiff for future medical care.  For the following reasons, we do not find this argument persuasive.

¶ 53        A trial court's ruling on a motion for a remittitur is reviewed only for an abuse of discretion.  *Diaz v. Legat Architects, Inc.*, 397 Ill. App. 3d 13, 45 (2009); *Kindernay*, 366 Ill. App. 3d at 572.[2] As we already observed above in the prior section, an abuse of discretion occurs only when the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court. *In re Marriage of Heroy*, 2017 IL 120205, ¶ 24.

¶ 54        "The determination of the amount of damages is a function reserved for the trier of fact, and a reviewing court will not lightly substitute its opinion for the judgment rendered in the trial court." *Kindernay*, 366 Ill. App. 3d at 572. "A jury's award will not be subject to a remittitur if it falls within the flexible range of conclusions reasonably supported by the facts." *Kindernay*, 366 Ill. App. 3d at 572.  See also *Epping*, 315 Ill. App. 3d at 1072; *Lee v. Chicago Transit*

_____

[2] In *Epping v. Commonwealth Edison Co.*, 315 Ill. App. 3d 1069, 1073 (2000), the appellate court phrased the standard of review differently, stating that a reviewing court owed deference to the discretion of the jury to determine damages but that it should review the trial judge's denial or grant of a remittitur *de novo*. Whether we employed a *de novo* or an abuse of discretion standard, our finding on this issue would be the same.

*Authority*, 152 Ill. 2d 432, 470 (1992) (an award should not be subject to remittitur if it "falls within the flexible range of conclusions which can be reasonably supported by the facts").

¶ 55    For example, in *Diaz*, the jury awarded damages for future medical costs, and the trial judge granted a remittitur. *Diaz*, 397 Ill. App. 3d at 44.  This court reversed the trial court's grant of a remittitur, explaining:

> "We conclude that the trial court abused its discretion in granting a remittitur in the amount of costs for future treatment testified to by Dr. Skaletsky.  The evidence established that [plaintiff's] condition was permanent and that he remained at risk for future injury.  The evidence further established that he continued to experience pain and loss of strength and that there were further treatments available to give him some relief.  It was, therefore, a reasonable inference from the evidence that [plaintiff] will continue to incur medical and medically related expenses for pain relief and to help him cope with the restrictions imposed on him as a result of his injuries.  Given that his past medical bills were $132,000 for the six years between his accident and the trial in this case and that his life expectancy was 21 years, an award of $201,000 for future medical expenses was supported by the evidence." *Diaz*, 397 Ill. App. 3d at 47.

¶ 56　　For all the reasons that this court found that the trial court in *Diaz* had abused its discretion, we must find in this case that the trial court did not abuse its discretion by denying defendant's motion of remittitur. First, as in *Diaz*, the evidence established that plaintiff's injury was "permanent." *Diaz*, 397 Ill. App. 3d at 47. Dr. Basram testified that, on September 3, 2013, almost two months after the incident, plaintiff had "some collapse or shortening through the fracture leaving his two legs at a different length." Second, as in *Diaz*, plaintiff "remained at risk for future injury." *Diaz*, 397 Ill. App. 3d at 47. Dr. Basram testified that, on August 26, 2014, over a year after the incident, "more of [the screw] is coming out from the outside of the bone which means the actual break is actually collapsing, and *** with more prominent hardware his fracture was going on to collapse and become shorter and shorter." Third, as in *Diaz*, "the evidence further established that he continued to experience pain and loss of strength." *Diaz*, 397 Ill. App. 3d at 47. Dr. Basram testified that, on August 16, 2016, over two years after the incident, plaintiff was experiencing more pain and using an assistive device to walk, and the x-rays showed "more collapse and migration of the hardware." Fourth, as in *Diaz*, "there were further treatments available to give him some relief." *Diaz*, 397 Ill. App. 3d at 47. Dr. Basram testified, "based upon a reasonable degree of medical and surgical certainty," that plaintiff was "going to require the hardware removal and

arthroplasty procedure for his hip."   In sum, we agree with the *Diaz* court that, based on this evidence, it was "a reasonable inference from the evidence" that plaintiff will continue to incur medical expenses "as a result of his injuries." *Diaz*, 397 Ill. App. 3d at 47.

¶ 57    In *Diaz*, we found that, given past medical bills of $132,000 for the six years between the incident and the trial, and a life expectancy of 21 years, an award of $200,000 for future medical expenses was not unreasonable.  *Diaz*, 397 Ill. App. 3d at 47.   Similarly, in the case at bar, given stipulated past medical bills of $54,263.70 for the three years between the incident and the trial and a stipulated life expectancy of 16 years, we cannot find that a calculation of $70,000 for future medical expenses constituted an abuse of discretion.   As noted, the actual award for future medical expenses is half that, or only $35,000, since the amount was reduced by half by the jury as a result of plaintiff's contributory negligence.

¶ 58    Thus, we cannot find that the trial court abused its discretion by denying defendant's motion for a remittitur for the amount that the jury awarded plaintiff for future medical expenses.

¶ 59                          CONCLUSION

¶ 60    On appeal, defendant argued:  (1) for a new trial, on the ground that the trial court erred in allowing evidence of defendant's internal safety rules and

regulations; or (2), in the alternative, for a remittitur of the damages that the jury awarded plaintiff for future medical care. For the foregoing reasons, we do not find these claims persuasive, and we affirm the jury's verdict and award.

¶ 61        Affirmed.